## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AARP,<br><br>            Plaintiff,<br><br>v.<br><br>UNITED STATES<br>EQUAL EMPLOYMENT<br>OPPORTUNITY COMMISSION,<br><br>            Defendant. | Case No.: 16-cv-2113 |

## COMPLAINT

## INTRODUCTION

1.      "A person's bodily integrity and private medical information are of paramount importance, and are protected by the ADA[1] and GINA.[2] These interests should not be invaded lightly or without a thorough consideration of all of the legal, equitable, and practical consequences." Br. for U.S. Equal Employment Opportunity Commission ("EEOC") at 3-4, *EEOC v. Honeywell, Inc.*, No. 14-cv-04517 (D. Minn. Oct. 27, 2014). The EEOC rightly argued in 2014 that because an employer imposed heavy penalties on employees through a coercive wellness program, employees stood to "lose the fundamental privilege under the ADA and GINA to keep private information private." *Id.* at 23. Yet, in 2016, the EEOC issued regulations under the ADA and GINA that allow employers to impose heavy financial penalties on employees who do not participate in employee wellness programs. On average, these

---

[1] Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, et seq. (2012).
[2] Genetic Information Nondiscrimination Act ("GINA"), 42 U.S.C. §§ 2000ff, et seq. (2012).

penalties would double or even triple those employees' individual health insurance costs.

2.     Because most wellness programs involve the collection of medical information through detailed medical questionnaires and biometric testing, the 2016 rules enable employers to penalize employees substantially for choosing not to divulge medical or genetic information about themselves or their families in the workplace. And, rather than giving this change of heart "thorough consideration of all the legal equitable, and practical consequences," the agency's final rules responded to a flood of concerned commenters with nothing more than the bald assertion that the rules are not coercive and "effectuate the purposes" of all relevant laws. EEOC, Regulations Under the Americans With Disabilities Act, 81 Fed. Reg. 31,126, 31,129 (May 17, 2016) ("2016 ADA Rule"); EEOC, Regulations Under the Genetic Information Nondiscrimination Act of 2008, Final Rule, 75 Fed. Reg. 68,912, 31,146 (Nov. 9, 2010) ("2010 GINA Rule"). That is cold comfort for workers who will now lose the "fundamental privilege" the agency vigorously defended only two years ago. *See* EEOC Br., *EEOC v. Honeywell, Inc.*, No. 14-cv-04517, at 23.

3.     The EEOC's 2016 wellness rules ("2016 Rules") enable employers to pressure employees to divulge their own confidential health information and the confidential genetic information of their spouses as part of an employee "wellness" program. 29 C.F.R. §§ 1630.14(d)(3), 1635.8(b)(2)(iii) (2016). Yet, the ADA and GINA expressly protect employees' medical privacy from such coercion.

4.     The ADA and GINA generally prohibit employer requests for employees' (and dependents') medical data – including virtually all queries likely to reveal disability-related or genetic information – because of Congress' conclusion that such revelations lead to employment discrimination. *See* 42 U.S.C. §§ 12112(d)(4), 2000ff-1 (2012). Indeed, improper employer questions themselves constitute illegal discrimination under both statutes. *Id.* And, while the ADA and GINA include narrow exceptions for medical inquiries in the context of wellness programs, each law requires participation in such programs' collection of medical or genetic data to be strictly "voluntary." 42 U.S.C. §§ 12112(d)(4)(B), 2000ff-1(b)(2).

5.     In enacting the ADA's prohibitions on employers' power to require employees to submit to medical inquiries and exams, Congress expressed concern about the potential for facilitating employment discrimination and also for giving rise to stigma that exacerbates discriminatory harm to employees with disabilities in the workplace.  Indeed, Congress specifically addressed the abuse of employee medical information in wellness programs, which it thought could be used "for the purpose of limiting health insurance eligibility or preventing occupational advancement and must be kept confidential." H.R. Rep. No. 101-485, pt. 2 at 75 (1990) ("ADA House Report").

6.     Likewise, in enacting GINA, while Congress recognized the "enormous opportunities" that genetic testing provided in identifying and treating disease, it also recognized the public's well-founded fears that employment discrimination would impede these advances if employers had access to their employees' genetic

information.  S. Rep. No. 110-48, at 6-7 (2007) ("GINA Senate Report"). Congress included employees' biological relatives, spouses, and adopted children within GINA's protections "because of the potential discrimination an employee or member could face because of an employer's or other entities' concern over [each of the employee's insured family members'] potential medical or other costs and their effect on insurance rates." *Id.* at 28.

7.      For fifteen years, consistent with Congress' intent, the EEOC maintained that employee wellness programs implicating confidential medical information are voluntary only if employers neither require participation nor penalize employees who choose to keep their medical and genetic information private.

8.      The 2016 Rules depart starkly from the EEOC's longstanding position. Under the 2016 ADA Rule, employers may penalize employees by up to 30% of the full cost of individual (also called "self-only") health insurance premiums (both employee and employer contributions), if they invoke their right to keep medical information confidential. 29 C.F.R. § 1630.14(d)(3). Under the 2016 GINA Rule, employers may charge an additional 30% penalty – for a total, under both rules, of up to 60% of the full cost of individual health insurance premiums – where an employee keeps a spouse's medical information confidential. 29 C.F.R. § 1635.8(b)(2)(iii).

9.      In the 2016 Rules, the EEOC failed to adequately justify this dramatic reversal, which is contrary to the ADA's and GINA's text as well as

Congress' clear intent to insure that employees are unencumbered by employer efforts to pressure them to reveal medical and genetic information likely to facilitate illegal workplace discrimination.

10.     Therefore, AARP, on behalf of its aggrieved members, brings this action against the EEOC for declaratory judgment and permanent injunctive relief under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 et seq. (2012), the ADA, and GINA.

11.     In support of its challenge to the 2016 Rules, AARP alleges as follows:

## JURISDICTION AND VENUE

12.     This action is a request for judicial review of a final agency action under the APA, 5 U.S.C. §§ 702-706 (2012). Therefore, this Court has jurisdiction under 28 U.S.C. § 1331 (2012).

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1) (2012) because both AARP's and the EEOC's headquarters are located in this district, and because the events giving rise to the claim occurred in this district.

14.     AARP has associational standing to bring this suit on behalf of its members. *Hunt v. Washington Apple Advert. Comm'n*, 432 U.S. 333 (1977). In particular:

    a.     Many of AARP's members would have standing to sue in their own right because they will be adversely affected by the rules.  These members face imminent harm flowing directly from the rules because the rules will cause them to either incur significant financial penalties or divulge

ADA- and GINA-protected health and genetic information when they do not wish to do so. That information, once revealed, will never be confidential again.

b.     The interests that AARP seeks to protect on behalf of its members are germane to AARP's purposes: addressing the needs and representing the interests of people age fifty and older and fighting to protect older people's financial security, health, well-being, and civil rights, including protections from discrimination in employment.

c.     Neither the claims asserted nor the relief requested requires individual AARP members to participate in the lawsuit.

## PARTIES

15.    AARP is a nonpartisan, nonprofit, organization dedicated to addressing the needs and representing the interests of people age fifty and older and fighting to protect older people's financial security, health, and well-being. AARP, which has nearly 38 million members nationwide, is incorporated in the District of Columbia, where its headquarters and local DC office are located. More than 89,000 AARP members reside in Washington, DC. AARP strives through legal and legislative advocacy to preserve the means to enforce older workers' rights.

16.    Approximately one-third of AARP's members are employed full-time or part-time or are current jobseekers likely to be employed in the near future. These individuals are covered by Title II of GINA.

17.     Additionally, a disproportionate number of older workers have one or more actual "disabilities," a record thereof, and/or are perceived as having a disability, and are, therefore, protected by the ADA. Older workers are also more likely to have the very types of "invisible" disabilities – such as mental health conditions – that are likely to be revealed by medical questionnaires.

18.     AARP is committed to the ADA's and GINA's vigorous enforcement, including ensuring that workers retain both statutes' protection from mandatory, non-job-related medical inquiries and examinations and compelled disclosure of family medical history.

19.     The EEOC is the federal administrative agency responsible for administering and enforcing Title I of the ADA and Title II of GINA, which forbid employment discrimination. These Titles contain the statutory provisions that the EEOC has construed in the 2016 rules.

## FACTUAL ALLEGATIONS

### I.     Statutory and Regulatory Background

### A.     Voluntary collection of medical information through employee wellness programs under the ADA

20.     Under the ADA, enacted in 1990, an employer may not "require a medical examination" or "make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). However, employers "may conduct *voluntary* medical examinations, including *voluntary*

medical histories, which are part of an employee health program available to employees at that work site." *Id.* § 12112(d)(4)(B) (emphasis added).  Any prohibited inquiry or examination is, in itself, an act of discrimination under the ADA.  *Id.* § 12112(d)(1).

21.     Congress enacted these protections to prevent employers from discriminating and to combat stigma in the workplace against individuals with disabilities. H.R. Rep. No. 101-485, pt. 2, at 75-76 (describing "blatant and subtle stigma" in the workplace against persons with disabilities and describing the harm inherent in disclosure of medical conditions).

22.     In 2000, the EEOC promulgated ADA enforcement guidance providing that "[a] wellness program is 'voluntary' as long as an employer neither requires participation nor penalizes employees who do not participate." *EEOC Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act (ADA), General Principles*, Question 22 (July 27, 2000), https://www.eeoc.gov/policy/docs/guidance-inquiries.html#10 ("2000 ADA Guidance")

   **B.   Voluntary collection of genetic information, including family medical history, under GINA**

23.     Enacted in 2008, GINA forbids employers "to request, require, or purchase genetic information" from an employee.  42 U.S.C. § 2000ff–1(b) (2012).

24.     Like the ADA, in addressing employee wellness programs, GINA includes a narrow exception to this general prohibition. GINA allows employers to acquire employees' genetic information when "health or genetic services are offered

by the employer, including such services offered as part of a wellness program," but only if "the employee provides prior, knowing, *voluntary*, and written authorization." *Id.* § 2000ff-1(b)(2) (emphasis added).

25.     Under GINA, "genetic information" includes both information about an employee's genetic tests and those of an employee's "family members" as well as information about "the manifestation of a disease or disorder in family members" (also known as "family medical history"). *Id.* § 2000ff(4).

26.     In turn, GINA defines "family members" as dependents under the Employee Retirement Income Security Act of 1974 ("ERISA"), or those related (up to four degrees) to the employee or dependent. *Id.* § 2000ff(3). ERISA permits individuals to claim dependents "through marriage, birth, or adoption or placement for adoption." 29 U.S.C. § 1181(f)(2)(A)(iii).

27.     Thus, GINA protects from disclosure the medical histories of employees and their family members, regardless of whether those family members are blood relatives.

28.     GINA's legislative history underscores Congress' concern about workplace discrimination based on genetic information, emphasizing Congress' "compelling public interest in relieving the fear of discrimination and in prohibiting its actual practice in employment and health insurance." H. R. Rep. No. 110-28, pt. 3, at 2-3.

29.     As discussed further below, the EEOC promulgated regulations in 2010 that prohibited employers from penalizing employees for refusing to provide

genetic information – or incentivizing them to provide it – as part of an employee wellness program.  Regulations Under the Genetic Information Nondiscrimination Act of 2008, 75 Fed. Reg. 68912 (Nov. 9, 2010); 29 C.F.R. § 1635.8(b)(2)(i)(A) (2010) ("2010 GINA Rule"); *see infra,* Part I(D).

### C. HIPAA's rules regarding penalties/incentives in employee wellness programs, and the ACA's effects on those rules

30.    The Health Insurance Portability and Accountability Act of 1996 ("HIPAA") also addresses penalties/incentives in employee wellness programs.

31.    Congress enacted HIPAA to "reduce . . . barriers to obtaining health coverage by making it easier for people who change jobs or lose their jobs to maintain adequate coverage, and by providing increased purchasing power to small businesses and individuals." S. Rep. No. 104-156, at 1 (1995) ("HIPAA Senate Report").

32.    HIPAA generally prohibits discrimination based on "heath status-related factors,"[3] but permits some financial penalties/incentives as part of employee wellness programs, allowing health insurers to "establish[] premium discounts or rebates or modify[] otherwise applicable copayments or deductibles in return for adherence to programs of health promotion and disease prevention." 29 U.S.C. § 1182(b)(2)(B).

---

[3] These factors include disability, genetic information, and medical history, as well as insurance-related bases such as claims experience, receipt of health care, and evidence of insurability. 29 U.S.C. § 1182(a)(1).

33.     HIPAA regulations promulgated in 2006 limited the amount of
penalties/incentives for taking part in employee wellness programs "that require
satisfaction of a standard related to a health factor" (generally referred to as
"health-contingent programs") to "20 percent of the cost of employee-only coverage
under the plan."  26 C.F.R. § 54.9802-1(f)(2)(i) (2006).  This 20% rule did not apply
to "participatory programs" – those that typically use Health Risk Assessments.
Dep't of the Treasury, Dept. of Labor, & Dept. of Health & Human Servs.,
Incentives for Nondiscriminatory Wellness Programs in Group Health Plans; Final
Rules, 78 Fed. Reg. 33,158, 33,160-61 (June 3, 2013) (explaining health-contingent
and participatory wellness programs).

34.     HIPAA's 20% rule sought to allow flexibility in penalties/incentives
while avoiding "too heavy" a penalty on individuals who could not satisfy a health
factor. *Id.*; *see also* Dep't of the Treasury, Dep't of Labor, & Dep't of Health &
Human Services, Nondiscrimination and Wellness Programs in Health Coverage in
the Group Market, 71 Fed. Reg. 75,014, 75,018 (Dec. 13, 2006) ("2006 HIPAA
Rule").

35.     The 2006 HIPAA Rule cautioned, however, that "compliance with the
nondiscrimination [in health care] rules is not determinative of compliance with . . .
any other State or Federal law, including the ADA."[4] 26 C.F.R. § 54.9802-1(h); 2006
HIPAA Rule, 71 Fed. Reg. at 75,015.

---

[4] GINA had not yet been enacted.

36.     The 2006 HIPAA Rule further stated that compliance with HIPAA's rules "does not affect whether the provision or practice is permitted" under these laws, and that the rule "clarif[ies] the application of the HIPAA nondiscrimination rules to group health plans, which may permit certain practices that other laws prohibit." *Id.*

37.     In 2010, the Patient Protection and Affordable Care Act ("ACA") amended HIPAA by adjusting and codifying portions of these regulations. More relevantly, the ACA increased the 20% penalty/incentive limit for health-contingent wellness programs to 30% of the cost of self-only coverage, with an option for the Secretaries of the Treasury, Labor, and Health and Human Services to raise this limit to 50% at their discretion.  42 U.S.C. § 300gg-4(j)(3)(A) (2010).

38.     The ACA did not repeal or supersede any relevant provision of the ADA or GINA, as reflected by the fact that the ACA's wellness provisions did not contain the phrase "notwithstanding any other provision of law," as many other ACA sections do.

39.     Subsequently, the Department of the Treasury, the Department of Labor, and the Department of Health and Human Services revised the 2006 HIPAA Rule on wellness programs to reflect the ACA's amendments.  2013 HIPAA Rule, 78 Fed. Reg. 33,158.

40.     In a subsection entitled "no effect on other laws," the 2013 HIPAA Rule restates the ACA's 30% limit on penalties/incentives for health-contingent wellness programs but reaffirms the 2006 HIPAA Rule's statement that compliance with the

HIPAA Rule was not determinative of compliance with any other laws, including

the ADA.  45 C.F.R. § 146.121(h) (2013).

    **D.**    **2010 GINA rule implementing GINA and addressing incentives in employee wellness programs**

    41.    In 2010, after the ACA's amendments to HIPAA's wellness provisions,

the EEOC promulgated regulations implementing GINA.

    42.    The EEOC considered several approaches to voluntariness that would

have permitted the use of penalties/incentives to provide genetic information, but

ultimately decided against any such interpretation. Instead, the 2010 GINA Rule

forbids employers from exacting any penalties – or applying any incentives – that

are conditioned on providing genetic information. 75 Fed. Reg. at 68,912; 29 C.F.R.

§ 1635.8(b)(2)(i)(A) (2010).

    43.    The 2010 GINA Rule explained that employers could administer

biometric testing and Health Risk Assessments ("HRAs") – which typically capture

a wealth of detailed medical information about employees and their families – as

part of employee wellness programs, and they could offer incentives within HIPAA

(and ACA)[5] limits for completing those questions and tests. *Id.*

    44.    However, to comply with the statute's "knowing, voluntary, and

written authorization" requirement, employers would have to (1) notify the

employees that they were eligible for incentives regardless of whether they provided

---

[5] The regulations refer to HIPAA's 20%  limit, but note that the ACA will raise that
limit to 30% upon its effective date. 2010 GINA Rule, 75 Fed. Reg. at 68,923 n.12.

GINA-protected information; and (2) clearly identify all optional questions in any HRA. 29 C.F.R. § 1635.8(b)(1)(i)(A), (b)(2)(i)(A) (2010).

45.     The EEOC chose this approach to balance the benefits of genetic testing with the statutory voluntariness requirement. 2010 GINA Rule, 75 Fed. Reg. at 68,923.

46.     In addressing what information was protected under this provision, the 2010 GINA Rule echoed the statutory definition of covered "family member[s]" as including dependents "as the result of marriage." *Id.* § 1635.3(a)(1) (2010).

47.     The EEOC explained that Congress intentionally included spouses and adopted children in GINA's definition of "family member" to prevent employers from acquiring and then using a spouse's or adopted child's medical information to discriminate against the employee. 2010 GINA Rule, 75 Fed. Reg. at 68,915 (citing Senate GINA Report at 28).

48.     Thus, the 2010 GINA Rule expressly forbid any penalties/incentives attached to providing any statutorily-protected genetic information through an employee wellness program, including spousal medical history. 29 C.F.R. § 1635.8(b)(2)(i)(A) (2010).

## II.    2016 EEOC Wellness Regulations Under the ADA and GINA

49.     In its 2016 rulemakings concerning employee wellness programs, the EEOC reversed course from its longstanding position against penalizing employees who choose not to divulge medical or genetic information to their employers.

50.     Under the 2016 Rules, employers may penalize employees who do not disclose private health and genetic information through wellness programs. Employers' "inducements" may be monetary or non-monetary, and they may be framed as rewards for participation or punishments for declining to participate.

51.     The 2016 Rules allow employers to use these penalties/incentives regardless of whether the employee is enrolled in the employer's group health plan – and even where the employer does not offer a group health plan at all. The penalties/incentives are permissible so long as they do not exceed a specific monetary value.

## A.     Penalties deemed "voluntary" under the 2016 ADA Rule

52.     The 2016 ADA Rule provides that employers' use of "incentives (financial or in-kind)" in employee wellness programs, "whether in the form of a reward or penalty, will not render the program involuntary if the maximum allowable incentive available under the program . . . does not exceed . . . thirty percent of the total cost of self-only coverage."  29 C.F.R. § 1630.14(d)(3) (2016).

53.     Under the 2016 ADA Rule, employers may penalize employees who choose not to answer medical inquiries or to undergo medical examinations even when they are not enrolled in an employer's plan or where the employer offers no group health plan whatsoever. *Id.*

54.     Where an employee is not enrolled in the employer's group health plan, the permissible penalty/incentive percentage is, nonetheless, calculated using the plan's costs. *Id.*

55.     Where an employer offers no group health plan, the penalties/incentives are tied to the "second lowest cost Silver Plan for a 40-year-old non-smoker on the state or federal health care Exchange in the location that the covered entity identifies as its principal place of business." *Id.*

56.     The 2016 ADA Rule applies to all employee wellness programs that involve medical exams or inquiries and does not distinguish between health-contingent and participatory programs.  *Id.*

**B.     Penalties permitted under the 2016 GINA Rule**

57.     The 2016 GINA Rule also permits employers to exact significant penalties from employees who do not provide their spouses' medical histories through wellness programs' HRAs.  However, rather than accomplishing this result by redefining "voluntary," the GINA rule instead removes spousal medical history from the statute's protective ambit.  29 C.F.R. § 1635.8(b)(2)(iii) (2016).

58.     The 2016 GINA Rule echoes the 2000 ADA Guidance language, stating that employers may not acquire genetic information unless it is part of a "voluntary" employee wellness program, in which "the provision of genetic information by the individual is *voluntary*, meaning the covered entity neither requires the individual to provide genetic information *nor penalizes those who choose not to provide it*."  *Id.* § 1635.8(b)(2)(i)(B) (emphasis added).

59.     Consistent with this requirement, the 2016 GINA Rule retains a ban on attaching any financial incentives/penalties to the provision of "family medical history or other genetic information."  Employees must be allowed to receive any

permissible incentive – or avoid any penalty – irrespective of whether they provide that information. *Id.* § 1635.8(b)(2)(ii).

60.     Moreover, the final 2016 GINA Rule continues to acknowledge that a spouse "is a 'family member' under GINA as set forth at 42 U.S.C. 2000ff(4)(a)(ii) and 29 CFR 1635.3(a)(1)." 81 Fed. Reg. at 31,144 .

61.     Nevertheless, the 2016 GINA Rule expressly allows employers to penalize employees for refusing to provide *spousal* medical histories through HRAs in employee wellness programs.  The rule provides that an employer "may offer an inducement to an employee whose spouse provides information about the spouse's manifestation of disease or disorder as part of a health risk assessment."  29 C.F.R. § 1635.8(b)(2)(iii). Thus, both biological and adopted children's genetic tests and medical histories, as well as spouses' genetic tests, remain off limits – but spouses' medical histories are carved out of the law's protection.

62.     The 2016 GINA Rule sets permissible financial or in-kind penalties/incentives identically to the ADA regulations. However, the rule indicates that penalties/incentives arising out of the 2016 ADA Rule and the 2016 GINA Rule stack: employees who refuse to provide their own medical information and their spouse's medical history may be assessed a penalty/incentive worth up to 60% of employee-only health coverage—30% for the employee (under the ADA) and 30% for the employee's spouse (under GINA).  *Id.* § 1635.8(b)(2)(iii).[6]

---

[6] The 2016 GINA Rule is unclear as to whether the employer may exact this 60% penalty under GINA *alone*, or under the two Rules cumulatively, as described

63. The rule does not foreclose the possibility that both spouses' employee wellness programs could impose this 60% penalty concurrently, for a cumulative 120% penalty on the couple.

### C. Comments on proposed rules and EEOC response in final rulemaking

64. When the EEOC issued the Notices of Proposed Rulemaking for both the 2016 ADA and GINA rules, AARP filed comments expressing serious concerns about the penalty/incentive schemes.  AARP, Comment Letter on 2016 ADA Rule (June 19, 2015), http://www.regulations.gov/#!documentDetail;D=EEOC-2015-0006-0257 ("AARP ADA Comment"); AARP, Comment Letter on 2016 GINA Rule (Jan. 28, 2016) https://www.regulations.gov/document?D=EEOC-2015-0009-0074 ("AARP GINA Comment").

65. Pointing out the high average dollar value of penalties permitted by the rules, AARP explained that the rules allow employers to coerce employees into forfeiting the privacy and protection from discrimination guaranteed by the ADA and GINA, effectively vitiating those laws' "voluntary" requirements.  AARP ADA Comment at 3-4, 6; AARP GINA Comment at 4, 6.

66. Furthermore, AARP's comments explained the conflicts between the rules and the language of both statutes, and the EEOC's departure from its longstanding prohibition on employers' penalizing employees who exercise their

---

above. The most plausible reading is the latter, so AARP assumes that to be the rule's meaning.

right to keep their health information and family medical history private. AARP

ADA Comment at 3-6; AARP GINA Comment at 3-8.

67.     AARP's comments also described the particularly heavy toll that the

penalties/incentives would take on older workers, who are more likely to have the

less-visible disabilities – or conditions likely to be perceived as disabilities – and

medical histories that are at risk of exposure to discrimination through non-job-

related medical inquiries and exams.  AARP ADA Comment at 2-3; AARP GINA

Comment at 4.

68.     Many comments from individuals and interested organizations

expressed similar concerns about the 2016 ADA and GINA rules, describing the

coercion permitted by the rules, pointing out the EEOC's departure from its

longtime prohibition on penalties in "voluntary" wellness programs, and arguing

that the rules are inconsistent with their respective statutes.

69.     With regard to economic coercion, the comments detailed that:

a.     30% of employee-only coverage was, on average, approximately

$1,800 in 2014. Nat'l Women's Law Ctr., Comment Letter on 2016 ADA Rule,

at 5 (June 19, 2015), http://www.regulations.gov/document?D=EEOC-2015-

0006-0246 ("NWLC ADA Comment"); Nat'l Disability Rights and Educ. Fund,

Comment Letter on 2016 ADA Rule, at 6 (June 19, 2015),

http://www.regulations.gov/document?D=EEOC-2015-0006-0318; Bazelon

Ctr. for Mental Health Law, Comment Letter on 2016 ADA Rule, at 4 (June

19, 2015), http://www.regulations.gov/document?D=EEOC-2015-0006-0304

("Bazelon Center ADA Comment").

   b.  30% of family coverage was approximately $5,200 in 2014.

Members of Congress, Comment Letter on 2016 GINA Rule, at 2 (Feb. 2,

2016), http://www.regulations.gov/document?D=EEOC-2015-0009-0093;

Disability Rights Legal Ctr. Cancer Legal Res. Ctr., Comment Letter on 2016

GINA Rule, at 1 (Jan. 26, 2016),

http://www.regulations.gov/document?D=EEOC-2015-0009-0042; Genetic

Alliance, Comment Letter on 2016 GINA Rule, at 2 (Jan. 28, 2016),

http://www.regulations.gov/document?D=EEOC-2015-0009-0087; Consortium

of Citizens with Disabilities, Comment Letter on 2016 GINA Rule, at 4 (Jan.

28, 2016), http://www.regulations.gov/document?D=EEOC-2015-0009-0088;

Am. Civil Liberties Union, Comment Letter on 2016 ADA Rule, at 6 (June 25,

2015) https://www.regulations.gov/document?D=EEOC-2015-0006-0274

("ACLU ADA Comment).

   c.  Approximately 85% of employees contribute 20 to 30% of the

total premium for their insurance coverage, so that a 30% increase in

premiums (if the penalties/incentives were in the form of a premium

surcharge) would at least double the majority of these employees' health care

costs. Bazelon Center ADA Comment at 4; ACLU ADA Comment at 2, 6.

d.      On average, a 30% employee-only premium increase would cover

months' worth of child care and food, and nearly two months' rent, for the

average individual in the United States.  NWLC ADA Comment at 5.

e.      Penalties incurred from declining to divulge private health

information would fall more harshly on individuals with disabilities, who, on

average, have disproportionately lower incomes and higher medical costs

than the general population. ACLU ADA Comment at 2-3, 5; Am. Psych.

Ass'n, Comment Letter on 2016 ADA Rule at 2 (June 29, 2015),

http://www.regulations.gov/document?D=EEOC-2015-0006-0275; Epilepsy

Found., Comment Letter on 2016 ADA Rule at 5 (June 19, 2015),

http://www.regulations.gov/document?D=EEOC-2015-0006-0220.

70.      In issuing the final 2016 Rules under the ADA and GINA, the EEOC

acknowledged commenters' concerns about coercion and the agency's departure

from its prior positions.  2016 ADA Rule, 81 Fed. Reg. at 31134-35; 2016 GINA

Rule, 81 Fed. Reg. at 31152-53. However, the agency did not meaningfully address

these concerns.  Rather, the EEOC merely stated that the rules were "the best way

to effectuate the purposes of the wellness program provisions" of HIPAA, the ADA,

and GINA. 2016 ADA Rule, 81 Fed. Reg. at 31129; 2016 GINA Rule, 81 Fed. Reg. at

31146.

71.      While the EEOC altered the final GINA rule modestly by changing the

calculation for permissible penalties/incentives from its proposed form, the agency

did not appreciably alter the proposed scheme in any other way.  Likewise, the

EEOC did not alter the ADA final rule in any relevant way from the proposed rule to alleviate the concerns raised in the numerous substantive comments the agency received.

## CLAIMS FOR RELIEF

COUNT 1:    THE 2016 ADA RULE'S DEFINITION OF "VOLUNTARY" AS PERMITTING EMPLOYERS TO PENALIZE EMPLOYEES UP TO 30% OF PREMIUMS FOR REFUSING TO SUBMIT TO MEDICAL INQUIRIES AND EXAMINATIONS IS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION, AND CONTRARY TO LAW

72.    AARP incorporates by reference the factual allegations contained in the preceding paragraphs of this Complaint, as though set forth fully below.

73.    The EEOC's redefinition of "voluntary" in the 2016 ADA Rule is unlawful because it is not a reasonable construction of the statutory term in 42 U.S.C. § 12112(d)(4).

74.    "Voluntary" is defined as "of one's own free will," which means "unconstrained by interference" or "without valuable consideration."  The American Heritage Dictionary of the English Language, 4th ed., 1929 (2000); *see also Full Definition of Voluntary,* Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/voluntary (last visited Oct. 19, 2016) ("proceeding from the will or from one's own choice or consent," "unconstrained by interference," "acting or done of one's own free will without valuable consideration or legal obligation"). Thus, the term has two permissible meanings: uncompensated or non-coerced.

75.    The 2016 ADA Rule meets neither of these definitions because it (1) permits significant compensation for divulging confidential medical and genetic

information; and (2) enables employers to coerce many employees to submit to medical examinations or inquiries.

76.     The 2016 ADA Rule is also inconsistent with the ADA's statutory purposes of preventing the opportunity for disability-based employment discrimination and workplace stigma, which Congress recognized as potential consequences of employees' disclosing medical information to employers through wellness programs.

77.     Additionally, the 2016 ADA Rule is arbitrary and capricious because, among other things, the EEOC failed to engage in reasoned decision-making; to provide an adequate explanation for its decision; to offer a reasoned basis for its departure from its longstanding interpretation of the term "voluntary'; and to respond adequately to significant concerns raised in comments to the proposed rule.

78.     The EEOC has neither explained nor justified its conclusion that medical inquiries and examinations in wellness programs are "voluntary" as long as the penalty for refusing them does not exceed 30% of health insurance premiums for self-only coverage.

79.     The EEOC did not base the 30% penalty/incentive limit on any facts in the record, any economic analysis, or any other legal requirement, including any provision of HIPAA, as amended by the ACA.

80.     In the final 2016 ADA Rule, the EEOC did not adequately address the concerns raised in numerous comments about the coercion inherent in allowing large financial penalties/incentives.

81.     In redefining "voluntary," the EEOC failed to explain and justify its reversal of its longstanding position that medical inquiries and examinations are only "voluntary" if employees are not penalized for refusing them.

82.     This reversal is particularly inexplicable in light of the 2016 GINA Rule's definition of "voluntary" as meaning that employees are not penalized for exercising their right to keep genetic information private.

83.     Therefore, 29 C.F.R. § 1630.14(d)(3) is arbitrary, capricious, an abuse of discretion, and not in accordance with law. This section and all references thereto should be invalidated under 5 U.S.C. § 706(2).

**COUNT 2:    THE 2016 GINA RULE'S PENALTY/INCENTIVE SCHEME IS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION, AND CONTRARY TO LAW**

84.     AARP incorporates by reference the factual allegations of this Complaint, as though set forth fully below.

85.     The 2016 GINA Rule is contrary to the plain language of the statute.

86.     In the 2016 GINA Rule, the EEOC created an extra-statutory distinction between spousal medical history and other statutorily-designated "genetic information."  Under this scheme, employers may penalize employees and their spouses for refusing to provide this information, where penalties for withholding any other "genetic information" – including the employees' and their children's medical histories – remain forbidden.

87.     This scheme cannot be reconciled with the statutory definition of "family members" as including "dependents," 42 U.S.C. § 2000ff(3)(A), or the EEOC's own definition of spouses as covered "family members" whose medical

history is part of the employee's genetic information, 29 C.F.R. § 1635.3(a)(1). Spousal medical history is entitled to the same protections as other genetic information – which the regulations generally forbid employers from acquiring through financial penalties/incentives.

88.     The 2016 GINA Rule's penalty/incentive scheme also contradicts Congress' intent in enacting Title II of GINA to prevent workplace stigma and discrimination.

89.     Additionally, the 2016 GINA Rule is arbitrary and capricious because, among other things, the EEOC failed to engage in reasoned decision-making; to provide an adequate explanation for its decision; and to respond adequately to significant concerns raised in comments to the proposed rule.

90.     The EEOC has neither explained nor justified its decision to exempt spousal medical history from the protections that other statutory "genetic information" receives under the regulation.

91.     The EEOC has neither explained nor justified its decision to permit employers to pressure employees to provide spousal medical history using any financial or in-kind incentive or penalty up to the value of 30% of health insurance premiums for self-only coverage. Nor has it explained or justified its decision to allow employers to stack the 2016 ADA Rule's penalties/incentives with those deemed permissible under the 2016 GINA Rule, allowing for incentives/penalties totaling 60% of health insurance premiums.

92.     The EEOC has not explained the internal contradiction between the GINA regulations' no-penalty definition of "voluntary" and the 2016 GINA Rule's permission for employers to penalize employees for refusing to divulge their spouses' medical histories. Nor has the EEOC explained why the 2016 GINA Rule states that spousal medical history may only be obtained from an employee's spouse voluntarily, while simultaneously permitting employers to exact penalties for refusal to provide that information.

93.     The EEOC did not base the 2016 GINA Rule's penalty/incentive scheme on any facts in the record, any economic analysis, or any other legal requirement, including any provision of HIPAA, as amended by the ACA.

94.     In the final 2016 GINA Rule, the EEOC did not adequately address any of the concerns raised in numerous comments about either the exclusion of spousal medical information from GINA's protections or the coercion inherent in allowing significant financial penalties.

95.     Therefore, 29 C.F.R. § 1635.8(b)(2)(iii) is arbitrary, capricious, an abuse of discretion, and not in accordance with law.  These sections and all references thereto should be invalidated under 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

Wherefore, AARP prays that the Court:

   a.  Issue a declaratory judgment that 29 C.F.R. §§ 1630.14(d)(3) violates the ADA and the APA, and 1635.8(b)(2)(iii) violates GINA and the APA, and therefore, that both sections are unlawful;

b.  Vacate 29 C.F.R. §§ 1630.14(d)(3) and 1635.8(b)(2)(iii), and declare that any actions taken by the EEOC pursuant to these regulations are null and void;

c.  Issue a preliminary injunction and an order under 5 U.S.C. § 705, requiring the EEOC to stay the  applicability date for 29 C.F.R. §§ 1630.14(d)(3) and 1635.8(b)(2)(iii) until the matter is resolved;

d.  Award to AARP, and require the EEOC to pay, reasonable attorneys' fees and costs, as appropriate; and

e.  Grant such other relief as the Court deems appropriate.


Dated:  October 24, 2016                    /s/Dara S. Smith

                                            Dara S. Smith
                                            Daniel B. Kohrman
                                            AARP Foundation Litigation
                                            601 E St., NW
                                            Washington, DC 20049
                                            dsmith@aarp.org
                                            202-434-6280

                                            *Counsel for AARP*

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 24, 2016, I caused a true and correct copy of

the foregoing Complaint via hand delivery on the following parties:

U.S. Equal Employment Opportunity Commission
131 M St., NE
Washington, DC 20507

Loretta Lynch, Esq.
U.S. Attorney General
Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530

Channing D. Phillips, Esq.
U.S. Attorney for the District of Columbia
Judiciary Center Building
555 Fourth St., NW
Washington, DC 20530


Dated:  October 24, 2016                          /s/ Dara S. Smith