**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AARP,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 16-2113 (JDB)** |
| **UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** | |
| **Defendant.** | |

**MEMORANDUM OPINION**

Before the Court is AARP's motion for a preliminary injunction to prevent new regulations promulgated by defendant, the U.S. Equal Employment Opportunity Commission (EEOC), from becoming applicable on January 1, 2017.  See Pl.'s Mot. for Prelim. Injunction [ECF No. 2]. EEOC has promulgated two sets of regulations under statutes it administers, one under Title I of the Americans with Disabilities Act (ADA), see Regulations Under the Americans with Disabilities Act ("the ADA rule"), 81 Fed. Reg. 31,126 (May 17, 2016), and one under Title II of the Genetic Information Nondiscrimination Act (GINA), see Regulations Under the Genetic Information Nondiscrimination Act ("the GINA rule"), 81 Fed. Reg. 31,143 (May 17, 2016).  Both address the incentives that employers may offer employees for participating in healthcare wellness programs.  Many such wellness programs require employees to complete a health risk assessment form or undergo biometric screenings for risk factors, which may require employees to reveal information protected under either the ADA or GINA.  The new regulations promulgated by EEOC would permit employers to increase premiums for employee self-only coverage by up to 30% if

1

employees choose not to participate in employer sponsored wellness programs that solicit ADA-
or GINA-protected information.  The ultimate merits question in this case is whether EEOC's
regulations permitting such incentives are arbitrary and capricious under the Administrative
Procedure Act (APA) because, according to AARP, the incentives render the disclosure of GINA-
and ADA-protected information "involuntary" and thus permit coerced disclosure in violation of
the governing statutes.  AARP has moved for a preliminary injunction to enjoin the applicability[1]
of these regulations pending the Court's resolution of the merits.  For the reasons that follow, the
motion for a preliminary injunction is denied.

## I. <u>BACKGROUND</u>

This case concerns the complex intersection of the Americans with Disabilities Act (ADA),
the Genetic Information Nondiscrimination Act (GINA), the Health Insurance Portability and
Accountability Act (HIPAA), the Affordable Care Act (ACA), and their various implementing
regulations, as applied to employer-sponsored wellness programs.  Such programs have become
increasingly popular in recent years as a means of decreasing the cost of healthcare by promoting
and improving overall health in the insured population.  They vary widely in specific purpose and
design, but wellness programs may include, for example, programs to help employees quit
smoking, weight loss programs, and preventative health screenings.  <u>See, e.g.</u>, Healthcare.gov,
Wellness Programs, https://healthcare.gov/glossary/wellness-programs [https://perma.cc/4Y65-
QTYR].  As noted above, such programs often involve collecting medical information from
employees, including information about disabilities or genetic information, in order to assess
health risk factors.  Before reaching the arguments on the motion for a preliminary injunction, a

---

[1] The final rules were promulgated in May 2016, and became "effective" in July.  However, to give employers time to bring their wellness programs into compliance, EEOC delayed the "applicability" date of the rules until January 1, 2017.  In other words, the rules do not apply to current year (2016) health plans, but only to 2017 health plans and later.  ADA Rule, 81 Fed. Reg. at 31,126, 31,129; GINA Rule, 81 Fed. Reg. at 31,143, 31,147.

brief discussion of the statutory and regulatory framework governing these wellness programs is in order.

### A.   THE ADA, GINA, AND HIPAA

Title I of the ADA bars employers from requiring medical examinations or inquiring as to whether an individual has a disability unless the inquiry or examination is job-related and "consistent with business necessity."  42 U.S.C. § 12112(d)(4)(A).  However, an employer may conduct voluntary medical examinations, including voluntary medical histories, as part of an "employee health program."  Id. § 12112(d)(4)(B).  The term "voluntary" is not defined anywhere in the statute.  Likewise, Title II of GINA provides that an employer may not request, require, or purchase genetic information of an employee or the employee's family members.  42 U.S.C. § 2000ff-1(b).  Genetic information is defined to include an individual's genetic tests, the genetic tests of family members (including spouses), and the manifestation of a disease or disorder of a family member.  See id. § 2000ff(4)(A).  As in the ADA, there is an exception to the prohibition on the collection of this information where the employer offers health or genetic services, including wellness programs, as long as the employee's provision of the information is voluntary.  Id. §§ 2000ff-1(b)(2)(A)–(B).

HIPAA provides generally that group health plans, including plans offered through an employer, and health insurance issuers may not discriminate on the basis of "any health status related factor"; but covered entities, again including employers, may offer "premium discounts or rebates modifying otherwise applicable copayments or deductibles in return for adherence to programs of health promotion and disease prevention," a.k.a. wellness programs.  See 29 U.S.C. § 1182(b)(2)(B); 26 U.S.C. § 9802(b); 42 U.S.C. § 300gg-4(b).  Regulations promulgated jointly in 2006 by the Departments of Labor, Health and Human Services, and the Treasury (collectively

known as the tri-departments or the tri-agencies) capped the size of the reward that could be offered for participation in a wellness program at 20% of the cost of employee-only coverage, and defined "reward" to mean a discount <u>or</u> a penalty.  <u>See</u> Incentives for Nondiscriminatory Wellness Programs in Group Health Plans ("the 2013 HIPAA regulations"), 78 Fed. Reg. 33,158, at 33,166–67 (June 3, 2013) (discussing the 2006 regulations).  This gave covered entities the ability to increase an employee's premiums by up to 20% if an employee chose not to participate in an employer-sponsored wellness program.

These regulations divided wellness programs into two categories: those that are participatory and those that are health-contingent.  <u>Id.</u> at 33,160–61.  Participatory wellness programs either offer no reward or do not include conditions for obtaining a reward that are based on a standard related to a health factor.  Examples include programs that reimburse employees for all or part of the cost of a gym membership, or that provide a reward to employees for attending a health education seminar.  <u>Id.</u> at 33,161.  If a program is health-contingent, rewards are offered when an employee satisfies a standard related to a particular health factor; for example, if the employee successfully maintains a specified "healthy weight" or participates in a program aimed at a specific health factor, like a weight loss program.  <u>Id.</u>  The 20% cap applied only to health-contingent wellness programs.  <u>Id.</u> at 33,167.  In 2010, the ACA amended the nondiscrimination provisions of HIPAA to allow for rewards of up to 30% of the cost of coverage in exchange for participation in a health-contingent wellness program, and the tri-departments amended the 2006 regulations in 2013 to account for these legislative changes.  <u>Id.</u> at 33,180.

### B.  EEOC REGULATIONS & POLICY

Because the collection of employee medical information also implicates the nondiscrimination provisions of the ADA and GINA, EEOC has been involved in the regulation

of wellness program incentives as well, and its position has evolved over the last several years. Initially, EEOC issued ADA enforcement guidelines in 2000 which stated that the provision of ADA-protected information to an employer as part of a wellness program was "voluntary" "as long as an employer neither requires participation [in the wellness program] nor penalizes employees who do not participate." EEOC Enforcement Guidance on Disability-Related Inquiries and Medical Examinations, No. 915.002 (July 27, 2000), 2000 WL 33407181, at *16–17. In other words, employers could collect ADA-protected information as part of a wellness program, as long as they made clear to employees that providing the information was not a condition of obtaining any offered reward or incentive.

In 2009, EEOC issued a letter implying that it would adopt the tri-departments' reasoning in the 2006 HIPAA regulations and interpret the "voluntariness" requirement of the ADA to allow employers to provide incentives worth up to 20% of the cost of self-only coverage to provide protected information, thus altering its original position. See January 6, 2009 letter, "ADA: Disability Related Inquiries and Medical Exams/Mandatory Clinical Health Risk Assessment," available at http://pdfserver.amlaw.com/cc/WellnessEEOC2009.pdf; see also Chamber of Commerce of the United States of America, Comment Letter on Proposed Rulemaking Under the Americans with Disabilities Act, at 2 (June 19, 2015), https://www.regulations.gov/document?D=EEOC-2015-0006-0273. Shortly thereafter, however, EEOC rescinded the portion of this letter that permitted the use of incentives, concluding that the matter of incentives was not relevant to the question before it. See March 6, 2009 letter, "ADA: Disability Related Inquiries and Medical Examinations/Health Risk Assessment," available at http://pdfserver.amlaw.com/cc/WellnessEEOC2009.pdf, at 5. In 2010, EEOC first promulgated regulations under GINA, see Regulations Under the Genetic Information Nondiscrimination Act

of 2008, 75 Fed. Reg. 68,912 (Nov. 9, 2010), which echoed the 2000 ADA Guidance in providing that the provision of genetic information pursuant to a wellness program must be voluntary, "meaning the covered entity neither requires the individual to provide genetic information nor penalizes those who choose not to provide it." Id. at 68,935, codified at 29 C.F.R. §§ 1635.8(b)(2)(i)-(i)(B).

However, against the backdrop of the ACA and the 2013 HIPAA regulations increasing the cap on incentives for wellness programs, and as wellness programs became more popular, confusion ensued as to how EEOC's regulations regarding the ADA and GINA were meant to interact with changes made by the ACA regarding wellness programs. HIPAA explicitly permitted the use of incentives in wellness programs, but EEOC had so far prohibited the use of incentives where ADA- or GINA-protected information was concerned, thus limiting employers' ability to make use of wellness programs and the changes wrought by the ACA—or at least generating uncertainty as to what was and was not permitted. In 2012 the Eleventh Circuit added to this confusion when it concluded that wellness programs that are part of a bona fide group plan fell under the "safe harbor" provision of the ADA as a term of the health plan, an interpretation that would appear to have allowed employers to impose unlimited penalties or incentives on employees to induce them to participate in wellness programs, including those programs that required the disclosure of ADA-protected information. See Seff v. Broward Cty., Fla., 691 F.3d 1221 (11th Cir. 2012).[2] This interpretation thus conflicted with EEOC's 2000 ADA Guidance. The next year, EEOC acknowledged in a press release that "the meaning of 'voluntary' merits further clarification by the Commission." EEOC Press, Employer Wellness Programs Need Guidance to Avoid Discrimination (May 8, 2013), available at https://www.eeoc.gov/eeoc/newsroom/release/5-8-

---

[2] The new ADA rule explicitly rejects Seff's interpretation of the safe harbor provision. ADA Rule, 81 Fed. Reg. at 31,131.

13.cfm; <u>see also</u> Nat'l Industry Liaison Grp., Comment Letter on Proposed Regulations Under the Americans with Disabilities Act, at 2 (June 19, 2015), <u>available at</u> https://www.regulations.gov/document?D=EEOC-2015-0006-0287.

Yet in 2014 EEOC brought three enforcement actions against employers who offered various incentives to provide ADA- and GINA-protected information as part of their wellness programs, drawing criticism because the agency had not yet issued regulations to address the interaction between the ADA, GINA, and the increased popularity of incentive-driven wellness programs after the enactment of the ACA. <u>See</u> <u>EEOC v. Orion Energy Sys., Inc.</u>, No. 14-1019 (E.D. Wis. filed Aug. 20, 2014); <u>EEOC v. Flambeau, Inc.</u>, No. 14-638 (W.D. Wis. filed Sept. 30, 2014); <u>EEOC v. Honeywell Intern., Inc.</u>, No. 14-cv-4517 (D. Minn. filed Oct. 27, 2014); <u>see also</u> <u>Honeywell</u>, 2014 WL 5795481, at *5 (D. Minn. Nov. 6, 2014) (noting that "[r]ecent lawsuits filed by the EEOC highlight the tension between the ACA and the ADA and signal the necessity for clarity in the law so that corporations are able to design lawful wellness programs and also to ensure that employees are aware of their rights under the law").

Hence, after a notice and comment period, EEOC in May 2016 issued the final rules that are the subject of this litigation in order to address this regulatory gap. The final ADA rule provides that the use of a penalty or incentive of up to 30% of the cost of self-only coverage does not render "involuntary" a wellness program that seeks the disclosure of ADA-protected information.[3] <u>See</u> ADA Rule, 81 Fed. Reg. at 31,133–34. The final GINA rule permits employers to offer incentives, again up to 30% of the cost of self-only coverage, to employees to disclose

---

[3] Both the ADA and GINA rules include several different methods of calculating this 30% incentive, depending on the type of plan the employer offers and the type of plan the employee is enrolled in. All of these methods, however, result in an incentive cap that is 30% of the cost of self-only coverage under either the employee's plan or a base-line health plan. <u>See</u> ADA Rule, 81 Fed. Reg. at 31,135; GINA Rule, 81 Fed. Reg. at 31,154.

information about a spouse's (and only a spouse's) [4] manifestation of disease or disorder (which constitutes genetic information of the employee under GINA) as part of a health risk assessment in connection with a wellness program.  See GINA Rule, 81 Fed. Reg. at 31,144.  Note that both of these rules apply not just to health-contingent wellness programs, as described in the 2013 HIPAA regulations, but to participatory wellness programs as well.

AARP filed this case on behalf of its members on October 24, 2016, challenging these two rulemakings under the APA, 5 U.S.C. §§ 702–06.  They complain principally that the definition of "voluntary" adopted by the agency is inconsistent with both the ADA and GINA, because permitting incentives at up to 30% of the cost of coverage renders the incentives coercive.  Second, they argue that the agency's reversal on the meaning of "voluntary" from the 2010 GINA rule and the 2000 ADA guidance is inadequately explained and unsupported by the administrative record, and therefore is arbitrary and capricious in violation of the APA.  At present, they request a preliminary injunction to stay the applicability of the two rules, which begin applying to health plans based on the plan's anniversary date—the date the plan year turns over and the plan renews— beginning on January 1, 2017.[5]

## II. DISCUSSION

The government raises two arguments regarding the motion for a preliminary injunction.
First, the government argues that AARP has failed to establish that it has associational standing to

---

[4] The rule does not permit employers to collect this information from the employee or the employee's children, only from the employee's spouse.  EEOC concluded that collecting information from a spouse does not pose the same risk of genetic discrimination because the spouse's medical history does not reveal anything about the genetic history of the employee, even though spousal medical history is technically defined as "genetic information" of the employee.  GINA Rule, 81 Fed. Reg. at 31,147.  Hence, incentives are permissible when it comes to the collection of a spouse's medical history, but remain prohibited under the GINA rule with respect to the medical history of the employee and the employee's children.

[5] In other words, if a health plan's anniversary date is January 10, the new rules begin applying to that plan on January 10, 2017.  If another plan has an anniversary date of March 15, the new rules begin applying to that plan on March 15, 2017.

bring this challenge on behalf of its members.  See Hunt v. Washington Apple Advert. Comm'n, 432 U.S. 333 (1977).  Second, the government argues that AARP has failed to satisfy the requirements for a preliminary injunction.  The Court will address each issue in turn.

### A.  STANDING

A plaintiff "bears the burden of showing that he has standing for each type of relief sought." Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009).  Where, as here, a plaintiff seeks a preliminary injunction, "the plaintiff's burden to demonstrate standing 'will normally be no less than that required on a motion for summary judgment.'"  Food & Water Watch, Inc. v. Vilsack, 79 F. Supp. 3d 174, 186 (D.D.C. 2015) (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 907 n.8 (1990)).  Furthermore, the regulations that AARP challenges apply to employers, not to AARP or its members directly, and hence standing is "substantially more difficult to establish" because harm to the plaintiff from the regulations depends on the actions of the third-party employer.  See Ass'n of Private Sector Colls. & Univs. v. Duncan, 681 F.3d 427, 457–58 (D.C. Cir. 2012) (quoting Summers, 555 U.S. at 493).  Nevertheless, standing may be established where, for example, "the record present[s] substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress."  Nat'l Wrestling Coaches Ass'n v. Dep't of Educ., 366 F.3d 930, 941 (D.C. Cir. 2004).

Organizations, like AARP, may assert standing in one of two ways.  First, an organization may assert standing on behalf of itself as an institution, in which case the standing analysis is the same as that for individuals.  Second, where an organization itself has not suffered an injury, but its members have, the organization may bring suit on behalf of its members.  See Conservative Baptist Ass'n of America, Inc. v. Shinseki, 42 F. Supp. 3d 125, 129 (D.D.C. 2014) (citing Am. Legal Found. v. FCC, 808 F.2d 84, 89 (D.C. Cir. 1987)).  The latter is known as associational

standing.  AARP does not argue that it has organizational standing itself to challenge the ADA and

GINA rules; it asserts only a theory of associational standing to bring suit on behalf of its members.

To establish associational standing, an organization must show that: (1) at least one of its members

would have standing to sue in his or her own right; (2) the interests it seeks to protect are germane

to its purpose; and (3) neither the claim asserted nor the relief requested requires the participation

of an individual member of the organization in the suit.  Hunt, 432 U.S. at 342–43.  EEOC raises

two principal challenges to AARP's associational standing.  First, it argues that AARP has not

demonstrated that it is a membership organization able to assert associational standing within the

meaning of Hunt, because it did not present any evidence of "traditional indicia of membership."

See id. at 344.  Second, EEOC argues that AARP has not presented sufficient evidence that one of

its individual members would have standing to sue in his or her own right.

     1.   Membership organization

In Hunt, the Supreme Court identified several "indicia of membership," which, if present,

render a non-membership organization—in that case, a state agency—sufficiently akin to a

"traditional" membership organization for purposes of associational standing.  Id. at 344–45.

Indicia of membership include: whether members play a role in selecting the organization's

leadership, guiding the organization's activities, and financing the organization's activities.  Id.;

see also Am. Legal Found., 808 F.2d at 91.  The goal of this inquiry is to ensure that the

organization claiming associational standing actually represents the individual "members" on

whose behalf it purports to bring suit.

EEOC argues that AARP has failed to demonstrate that it has members with the required

indicia of membership.  AARP, on the other hand, argues that the "indicia of membership" inquiry

is only necessary when an organization has no members at all, but is trying to claim that it is the

"functional equivalent" of a membership organization, as the state agency did in <u>Hunt</u> itself.  <u>Hunt</u>,

432 U.S. at 344–45.  Where an organization is a "traditional" membership organization, AARP

argues, this inquiry is unnecessary.  At least one decision in this district supports this view.  <u>See</u>

<u>Brady Campaign to Prevent Gun Violence v. Salazar</u>, 612 F. Supp. 2d 1, 29 (D.D.C. 2009) ("The

inquiry into indicia of membership . . . is necessary only when an organization is not a "traditional

membership organization." (internal quotation marks omitted)).  This view, however, seems to beg

the question: what then defines a "traditional membership organization," if not the "indicia of

membership" identified in <u>Hunt</u>?  What does it mean to be a "member" of an organization?

There appears to be a gap in the associational standing case law about when or how the

indicia of membership inquiry should be applied.  Most cases skip over the indicia of membership

inquiry where "membership" is asserted, although it is equally clear that a mere assertion that an

individual is a "member" of an organization is not sufficient to establish membership.  <u>See, e.g.</u>,

<u>Washington Legal Found. v. Leavitt</u>, 477 F. Supp. 2d 202, 210 (D.D.C. 2007).  AARP is correct,

however, in pointing out that many of the cases that do discuss indicia of membership are those in

which the organization at issue clearly does not have members.  <u>See, e.g.</u>, <u>Gettman v. Drug</u>

<u>Enforcement Admin.</u>, 290 F.3d 430, 435 (D.C. Cir. 2002) (readers of magazine were not members

for associational standing purposes); <u>Fund Democracy LLC v. SEC</u>, 278 F.3d 21, 25–26 (D.C. Cir.

2002) (past work with groups of individual investors did not render the investors "members" of

Fund Democracy); <u>Am. Legal Found.</u>, 808 F.2d at 89–90 (viewers who regularly watch the news

were not members of media watchdog group for associational standing purposes); <u>Conservative</u>

<u>Baptist Ass'n of Am.</u>, 42 F. Supp. 3d at 134 (individual members of congregation were not

members of an association made up exclusively of churches); <u>Washington Legal Found.</u>, 477 F.2d

at 210–11 (members on a mailing list, without more, did not constitute members for purposes of

associational standing).  But see Ctr. for Sustainable Econ. v. Jewell, 779 F.3d 588, 598 (D.C. Cir. 2015) (analyzing indicia of membership and concluding that plaintiff had established itself as a "traditional membership organization").

In any event, the Court need not resolve this finer point of associational standing law, because it concludes that AARP satisfies the "indicia of membership" criteria.  AARP serves a "discrete, stable membership with a definable set of common interests," id.—i.e., individuals over age 50—and counts over 38 million people as its members.  See AARP Bylaws [ECF No. 21-4] at 3; Boudreau Decl. [ECF No. 21-1] at 1.  It also has a "defined mission," see Ctr. for Sustainable Econ., 779 F.3d at 598: to enhance the quality of life for individuals as they age; to "further independence, dignity, and purpose for individuals as they age"; and to "improve the image of aging," AARP Bylaws [ECF No. 21-4] at 3.  Although the wider AARP membership does not elect AARP's governing Board of Directors, directors are required to be AARP members, and are chosen by other members of the Board, i.e., by other AARP members.  See id. at 4, 6.  The committees that advise the Board, including, for example, the Member and Social Impact Committee, also include AARP members.  Id. at 8.  Thus, AARP members "play a role in" the organization's leadership.  Members play a role in financing AARP's activities as well through the payment of membership dues, although it appears that not all AARP members are required to pay dues, as some members' dues are included in a spouse's membership.  See Opp'n Br. [ECF No. 14] at 12.  Nevertheless, AARP's membership dues account for 19% of its total revenue, or approximately $300 million.  Boudreau Decl. [ECF No. 21-1] at 2.  Finally, AARP's members play a role in guiding AARP activities by participating in various annual opinion polls and surveys, which are designed to solicit member input on AARP policy positions, and through participation

in AARP's various policy committees, which advise the Board of Directors through the National Policy Council.  Id. at 1.

It is certainly true that AARP's organizational structure makes less allowance for participation from the broader membership in the running of the organization than would, for example, an organization whose members are elected directly by the entire membership, whose revenues come entirely from member dues, and whose members are required to vote on all policy issues.  But the associational standing cases are unspecific about what it means to "play a role in" the leadership of an organization, the financing of an organization, and in "guiding" the organization's activities.  AARP's members play a role in all of these activities, and although they could play a stronger role, the government points to no cases, and the Court can find none, that suggest that what AARP's members do here is insufficient to qualify AARP as a "membership" organization for associational standing purposes.  For these reasons, the Court concludes that AARP has sufficiently demonstrated its status as a membership organization.

2.  Individual member's standing to sue

AARP must show that at least one of its members would have standing to sue in his or her own right regarding the ADA rule and the GINA rule.  See Nat'l Biodiesel Bd. v. EPA, No. 15-1072, 2016 WL 7368626, at *3 (D.C. Cir. Dec. 20, 2016); Am. Library Ass'n v. FCC, 401 F.3d 489, 492 (D.C. Cir. 2005).  Thus, AARP must show that at least one of its members will suffer an injury in fact as a result of the regulations, caused by EEOC, and redressable by judicial relief. See Stilwell v. Office of Thrift Supervision, 569 F.3d 514, 518 (D.C. Cir. 2009).  Again, plaintiff's burden here is made more difficult by the fact that EEOC's regulations do not directly regulate AARP or AARP's members: hence, AARP must show a "substantial probability" that one of its members will be harmed as a result of each rule.  Id.  EEOC does not appear to dispute either

causation or redressability.  Nor could it.  Even assuming that AARP can show a "substantial probability" of harm resulting from the rules, causation is established because EEOC is the agency responsible for promulgating and implementing these rules.  The Court also has the power to remedy this injury by enjoining the rules from becoming applicable.  Hence, the focus here is on whether AARP can show a substantial probability of injury to one of its members.

EEOC does not appear to dispute that, assuming membership is established, at least one of AARP's members would have standing to sue with respect to the ADA rule.  Declarant A states[6] that his employer has a wellness program, in which he has declined to participate, and as a result his premiums have increased substantially.  Were the penalty for non-participation to increase as a result of the new ADA rule, Declarant A states that he would incur financial harm.  Reply Br. [ECF No. 17] at 8–9; Decl. A [ECF No. 3-1].  An increase in premiums would certainly constitute an injury.  The question is whether this injury is sufficiently "certain."  Declarant A has not alleged that his employer definitively plans to raise its wellness program incentive to the 30% level approved by the ADA rule.  However, there is certainly a probability that Declarant A's employer will do so: the ADA rule is specifically designed to allow this, and Declarant A's employer already makes use of financial penalties for non-participation in its wellness program.  Furthermore, as discussed above, at least several comments from employers and industry groups during the notice and comment period indicated a desire for harmony between EEOC's rules and the HIPAA regulations implementing the 30% cap, so that employers could be certain that adopting such incentives were lawful under the ADA, indicating that many employers intend to take advantage of the increased incentive level.  "Put more generally, when an agency adopts a rule with the

---

[6] The member declarations submitted in support of AARP's motion have been sealed to protect the personal information of the declarants.  Accordingly, the Court's opinion only refers to information contained in the member declarations that the parties also discuss in their public briefs.

purpose and substantially probable effect of economically helping regulated Party A,"—here, employers covered by the ADA—"and hindering Party B," i.e., employees who do not want to participate in wellness programs, "Party B ordinarily will have standing to challenge the rule." Stilwell, 569 F.3d at 519.  Thus, AARP has sufficiently demonstrated that at least one of its members, Declarant A, would have individual standing to challenge the ADA rule.

A more difficult question is whether any of AARP's declarants would have individual standing to challenge the GINA rule.  Regarding the GINA rule, Declarant A states that he has family health insurance and describes the financial harm he would incur if his employer alters its wellness program to require disclosure of his spouse's medical information, which he states his spouse would not want to disclose.  Reply Br. [ECF No. 17] at 9–10; Decl. A [ECF No. 3-1]. Another declarant, Declarant B, is insured through her husband's employer, and merely states that, were her husband's employer to adopt a wellness program with an incentive for spousal medical information at the incentive limit provided for by the GINA rule, she would not be able to afford the increase in premium and would have to disclose her medical information.  Opp'n Br. [ECF No. 14] at 13; Decl. B [ECF No. 3-2].  But it is unclear from Declarant B's statement whether her husband's employer even has a wellness program, let alone that it is likely that the employer will adopt the 30% spousal incentive.  This does not come close to demonstrating a "substantial probability" of harm; it is instead purely speculative.  Declarant C's statement does not appear to have been submitted with the GINA rule in mind at all, as it makes no mention of spousal incentives, nor does the declaration indicate that Declarant C is even married.  Opp'n Br. [ECF No. 14] at 14; Decl. C [ECF No. 3-3].

Thus, neither Declarant B nor Declarant C would have standing to challenge the GINA rule.  The Court concludes, however, that Declarant A does, for the same reasons that Declarant A

has standing to challenge the ADA rule.  The 2010 GINA rule prohibited the use of incentives to solicit any GINA-protected information, including spousal medical history, see 2010 GINA Rule, 75 Fed. Reg. at 68,923; thus, Declarant A's employer could not currently offer a wellness program that includes spousal incentives. The 2016 GINA rule changes things.  Because Declarant A's employer already has a wellness program in place that uses financial incentives, it is likely that, once permitted to do so, it will adopt incentives for the collection of spousal information as well. Declarant A, furthermore, has indicated that this will economically harm him, because he would be forced to pay an even higher premium in order to protect his spouse's medical information. Reply Br. [ECF No. 17] at 9–10; Decl. A [ECF No. 3-1].  See Stilwell, 569 F.3d at 518–19. Declarant A therefore has standing to challenge the GINA rule.

3.  Germaneness

The government half-heartedly contends that the subject of this suit is not "germane" to AARP's purpose because AARP has not submitted any evidence that it has "special expertise" in the medical privacy interests implicated in this suit.  The bar for germaneness, however, is low. "Germaneness is satisfied by a 'mere pertinence' between litigation subject and an organization's purpose."  Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin., 901 F.2d 107, 111 (D.C. Cir. 1990).  The purpose of this test is to prevent "litigious organizations from forcing the federal courts to resolve numerous issues as to which the organizations themselves enjoy little expertise and about which few of their members demonstrably care."  Humane Soc'y of the United States v. Hodel, 840 F.2d 45, 57 (D.C. Cir. 1988); see also Washington Legal Found., 477 F. Supp. 2d at 212.  AARP's stated purpose is to promote security and quality of life for older individuals, and to advocate for their rights, and the organization's areas of policy interest include both health care and employment.  See AARP Bylaws [ECF No. 21-4] at 3; Boudreau Decl. [ECF No. 21-1]

at 1 (indicating that AARP has policy committees devoted to health care and to employment issues). Older workers certainly have an interest in avoiding discrimination on the basis of disability or genetic information, and government regulations that would allow employers to penalize employees for refusing to disclose health information protected by various anti-discrimination laws implicate these interests. AARP has therefore amply demonstrated that this suit is germane to its purpose.

4. Participation of an individual member

This last factor is not in dispute. AARP seeks only injunctive relief in this suit; thus, the Court is satisfied that neither the claims asserted nor the relief requested here requires the participation of one of AARP's individual members.

\*                    \*                    \*

Accordingly, the Court finds that AARP has associational standing to challenge both the ADA rule and the GINA rule on behalf of its members.

B. PRELIMINARY INJUNCTION

Having concluded that AARP has standing, the Court will now turn to the issue at hand: whether AARP is entitled to a preliminary injunction to prevent the ADA rule and the GINA rule from becoming applicable on January 1. A preliminary injunction is "an extraordinary and drastic remedy, [and] one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam) (internal quotation marks and emphasis omitted). A plaintiff seeking a preliminary injunction must establish: (1) that he or she is likely to suffer irreparable harm in the absence of injunctive relief; (2) a likelihood of success on the merits; (3) that the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. See, e.g., Aamer v. Obama, 742 F.3d 1023, 1038

(D.C. Cir. 2014).[7]  These latter two factors "merge when the Government is the opposing party." Cf. Nken v. Holder, 556 U.S. 418, 435 (2009).

1.   Irreparable injury

"[T]he basis of injunctive relief in the federal courts has always been irreparable harm." CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995) (quoting Sampson v. Murray, 415 U.S. 61, 88 (1974)); see also Newdow v. Bush, 355 F. Supp. 2d 265, 291 (D.D.C. 2005) (noting that irreparable harm is "[t]he lynchpin of a request for preliminary injunctive relief").  The D.C. Circuit "has set a high standard for irreparable injury."  Mexichem Specialty Resins, Inc. v. EPA, 787 F.3d 544, 555 (D.C. Cir. 2015) (internal quotation marks omitted). The plaintiff must demonstrate that the harm will be "both certain and great; it must be actual and not theoretical."  Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985).  "In short, the threatened injury must be of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm, because injunctions are not intended 'to prevent injuries neither extant nor presently threatened, but only merely feared.'"  Newdow, 355 F. Supp. 2d at 291–92 (quoting Comm. in Solidarity v. Sessions, 929 F.2d 742, 745–46 (D.C. Cir. 1991)).

Here, AARP claims that its members will suffer irreparable harm because many of them will be unable to afford the premium increase permitted under both the ADA and GINA rules, and so will be forced to disclose confidential medical information that they would not otherwise choose to disclose.  The disclosure being discussed here is not public disclosure; as the government points

---

[7] There is an ongoing debate as to whether courts may still use a "sliding scale" approach in analyzing these four factors, where a strong showing on one factor may compensate for a weaker showing on another.  The D.C. Circuit has suggested without deciding that this approach is called into question by the Supreme Court's decision in Winter v. Natural Res. Def. Council, 555 U.S. 7 (2008).  See Sherley v. Sebelius, 644 F.3d 388, 392–93 (D.C. Cir. 2011); see also id. at 393 (noting, "we read Winter at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction" (internal quotation marks omitted)).  Under either approach, however, AARP's motion for a preliminary injunction must be denied, because AARP's showing as to all factors is weak.

out, both statute and regulation, including HIPAA and the rules at issue here, limit the permissible disclosure of health information obtained through wellness programs. The ADA rule requires information obtained through wellness programs to be maintained in a separate medical file from other employee information and treated as a confidential medical record, with exceptions only for purposes of making reasonable ADA accommodations, facilitating emergency treatment, and responding to requests from government officials investigating ADA compliance. See 29 C.F.R. § 1630.14(d)(4)(i), (A)–(C). Furthermore, employers may not require an employee to agree to the sale, sharing, transfer or other disclosure of health information, except as necessary to carry out the wellness program. Id. § 1630.14(d)(4)(iv). The same is true under the GINA rule. Id. § 1635.8(b)(2)(iv).

The goal of each rule is to prevent employers from being able to use information disclosed as part of wellness programs to discriminate against employees, which, of course, would violate the ADA and/or GINA. Thus, the regulations, as well as HIPAA, are designed to guard against the discrimination that plaintiff fears. EEOC therefore argues that there is no risk of irreparable harm because the confidential information disclosed as a result of the new rules will be protected both by regulation and by statute, and so cannot be used for discriminatory purposes. True enough, but this argument misses the point that, at least in the abstract, the disclosure of confidential information in the first instance could still constitute irreparable harm, regardless of whether the employee is ultimately discriminated against based on that information. However, none of the three member declarations that AARP has submitted in support of its claim indicates that irreparable harm from this disclosure is in fact likely to occur, as a result of either the ADA rule or the GINA rule. That failing is indicative of the ultimate weakness of AARP's irreparable harm argument.

Declarant A states that he did not participate in his employer's wellness program in 2016 and, as a result, will be forced to pay a higher premium in 2017.  It does not appear that he is intending to participate in the wellness program in 2017.  Reply Br. [ECF No. 17] at 9; Decl. A [ECF No. 3-1].  Thus, Declarant A does not appear likely to suffer irreparable harm from being forced to disclose confidential medical information as a result of the ADA rule.  Being required to pay a higher premium constitutes harm, but it is an economic harm, which typically does not constitute irreparable harm, because the plaintiff can be made whole again through monetary damages.  See, e.g., Wisconsin Gas, 758 F.2d at 674 ("It is . . . well settled that economic loss does not, in and of itself, constitute irreparable harm.").  Regarding the GINA rule, Declarant A states that his spouse would not want to disclose her health information as part of a wellness program, and that if his employer imposed a penalty for her failing to do so, he would incur financial harm from the increased cost.  Reply Br. [ECF No. 17] at 9–10.  Again, this is not indicative of an irreparable injury, as Declarant A does not indicate that he would participate in a wellness program that required the disclosure of protected information about his spouse.  Hence, Declarant A does not appear to assert that he would suffer anything other than economic harm in the form of higher premiums as a result of either rule.  Presumably, if the rules ultimately were permanently enjoined later in 2017, higher premiums imposed on Declarant A or other employees while the rules were in effect could be reimbursed by health plans through premium adjustments.

Declarant B, as noted above, would be unlikely to even have standing to bring a claim, and does not state that her husband's employer has a wellness program or is likely to adopt one.  Opp'n Br. [ECF No. 14] at 13–14; Decl. B [ECF No. 3-2].  This declaration therefore does not evidence irreparable harm.  Declarant C states that he has been forced to participate in his employer's wellness program in the past and will again in 2017, because he cannot afford the increased

premium, seemingly indicating that he has <u>already</u> disclosed ADA-protected information.  Reply Br. [ECF No. 17] at 9 ("Declarant C states that he feels compelled to participate in his employer's plan in 2017, and because of the ADA rule . . . he will <u>again</u> submit personal health data for the current year.") (emphasis added); Decl. C [ECF No. 3-3].  Importantly, Declarant C does not indicate that the ADA rule would require him to submit <u>new</u> ADA-protected information that he has not already disclosed.  Absent such an indication, it appears that the harm that AARP and Declarant C principally allege (the coerced disclosure of ADA-protected information) has already occurred.  A preliminary injunction, therefore, would serve little purpose.

In addition, AARP's unexplained delay in bringing this suit weighs against a finding of irreparable harm, although it is not dispositive.  "An unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm."  <u>Newdow</u>, 355 F. Supp. 2d at 292 (citing cases); <u>Mylan Pharm., Inc. v. Shalala</u>, 81 F. Supp. 2d 30, 43–44 (D.D.C. 2000).  Several circuits have observed that delay in pursuing a preliminary injunction undercuts a claim of irreparable injury.  <u>See, e.g.</u>, <u>Ty, Inc. v. Jones Grp. Inc.</u>, 237 F.3d 891, 903 (7th Cir. 2001); <u>Tough Traveler, Ltd. v. Outbound Prods.</u>, 60 F.3d 964, 968 (2d Cir. 1995); <u>Fund for Animals v. Frizzell</u>, 530 F.2d 982, 987 (D.C. Cir. 1975).  The final rules at issue here were promulgated in May 2016, yet AARP waited until the end of October to file this suit, despite knowing that these rules were effective in July and would become applicable on January 1, 2017.  Quite aside from the fact that this delay has placed both this Court and the defendant in a difficult position, given the rules' looming applicability date, AARP's actions further undermine its argument that an injunction is urgently needed to prevent irreparable harm to its members.

To sum up, while the Court is sympathetic to the fact that these new rules implicate important privacy interests, at this time AARP has not submitted sufficient evidence that its members will suffer irreparable harm as a result of either the ADA rule or the GINA rule.  The Court may not manufacture irreparable injury for the plaintiff based on speculation that, given the size of AARP's membership, one of AARP's members somewhere may be compelled to disclose protected information for the first time in 2017.  That would be contrary to the requirement that the irreparable harm alleged is both certain and actual.   In short, AARP has failed to carry its burden to demonstrate that its members will suffer irreparable harm from either the ADA rule or the GINA rule.

2.  <u>Likelihood of success on the merits</u>

Plaintiff has also failed to demonstrate that it is likely to succeed on the merits.  AARP raises two principal arguments as to both the ADA rule and the GINA rule: first, that EEOC's interpretation of the term "voluntary" as permitting the use of this level of incentives is contrary to both statutes; and second, that EEOC did not adequately explain its reversal from its previous position that incentives were not permitted under either the ADA or GINA.  Typically, a court's review of federal agency action under the APA is a review of the agency's administrative record and a determination based on that record whether the agency's decision was arbitrary and capricious.  Courts must "liberally" defer to an agency's findings and sustain the agency's interpretation of its authorizing statute so long as that interpretation is "legally permissible," even if the court would otherwise adopt a different interpretation.  <u>See</u> <u>Ctr. for Sustainable Economy</u>, 779 F.3d at 600.  Here, because AARP requested an expedited review of this case given the January 1 deadline (necessary in part because of plaintiff's delay in bringing this suit), the administrative record could not be prepared in time for the Court's review.  Hence, the Court must make do with

the limited record before it.  Lacking the full administrative record, and given the deference the Court owes EEOC, the Court cannot conclude at this time that AARP is likely to succeed on the merits.

a.   Meaning of "voluntary"

Both parties agree that EEOC's interpretation of "voluntary" must be reviewed under the two-step analysis set forth in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  Under that analysis, a court first determines whether "Congress has directly spoken to the precise question at issue"; if so, Congress's meaning must control.  Id. at 842–43. But if instead the statute is silent or ambiguous as to the specific issue, the court must determine whether the agency's interpretation is based on a permissible construction of the statute.  Id. at 843.

The ADA provides that a "covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program."  See 42 U.S.C. § 12112(d)(4)(B).  Likewise, GINA permits a covered entity to collect the genetic information of an employee where "health or genetic services are offered by the employer, including such services offered as part of a wellness program," so long as the employee "provides prior, knowing, voluntary, and written authorization."  42 U.S.C. §§ 2000ff-1(b)(2)(A)–(B). Neither the ADA nor GINA offers a definition of the term "voluntary," or explains what it means to conduct a "voluntary" medical examination or to voluntarily provide medical information in order to participate in a wellness program.  Nothing in either statute, however, directly prohibits the use of incentives in connection with wellness programs; indeed, neither statute speaks to the level of permissible incentives at all.  The statute, therefore, appears to be ambiguous on this point,

leaving it to the agency to determine the exact contours of this provision.  EEOC, therefore, is entitled to some deference on this subject.

AARP, moreover, does not even argue that the term "voluntary" as used in either the ADA or GINA prohibits the use of <u>all</u> incentives.  Instead, it is quite adamant that it only objects to the <u>specific</u> incentives EEOC has adopted: 30% of the cost of self-only coverage under both the ADA and GINA rules, or 60% of the cost of self-only coverage if the incentives/penalties are stacked.  <u>See</u> Reply Br. [ECF No. 17] at 17.  In other words, AARP's position is that by permitting this <u>level</u> of incentives, EEOC is allowing coercion.  Based on the record before it, the Court cannot conclude that AARP is likely to succeed in this argument.  The determination as to what <u>level</u> of incentives is permissible is exactly the kind of agency determination to which the Court owes some deference.  As EEOC explains in both rulemakings, it selected these incentive levels to harmonize its interpretation of the ADA and GINA with the changes made to HIPAA by the ACA, which caps wellness program incentives at 30%.  ADA Rule, 81 Fed. Reg. at 31,129, 31,132, 31,134–35; GINA Rule, 81 Fed. Reg. at 31,146.  There is nothing in either the ADA or GINA to indicate that the particular incentive level EEOC selected is not permitted by the statute.  EEOC's choice of the permissible incentive level, then, is not irrational.  The new regulations may permit employers to offer a strong incentive to their employees to disclose health information, but as other courts, including the Supreme Court, have recognized, "[a] hard choice is not the same as no choice." <u>United States v. Martinez-Salazar</u>, 528 U.S. 304, 315 (2000).  On the record currently available to the Court, AARP is not likely to succeed on its merits argument.

b.   Adequate explanation

For similar reasons, the Court cannot conclude on the record before it that AARP will succeed in arguing that EEOC failed to adequately explain its decision.  An agency action will be

found arbitrary and capricious if it is not the product of "reasoned decision-making." <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.</u>, 463 U.S. 29, 52 (1983). Agencies are permitted to change their minds, however, so long as they explain the reason for the policy change, and the agency is not subject to any more scrutiny when it does change its position than when it is regulating in the first instance. <u>See</u> <u>FCC v. Fox Television Stations, Inc.</u>, 556 U.S. 502, 515 (2009). Here, AARP argues that EEOC did not give a reasoned explanation as to why it has reversed a long held position that incentives were not permitted under the ADA or GINA.

Again, it is difficult for the Court to make this determination without benefit of the full administrative record, which makes it harder for AARP to carry its heavy burden at the preliminary injunction stage. Without the administrative record, the Court is not able to analyze in detail either the agency's reasoning or AARP's arguments as to why EEOC's reasoning is faulty. But based on the record now before the Court the agency has offered a seemingly reasonable explanation for its change of heart. EEOC's previous interpretation of both the ADA and GINA, in prohibiting the use of incentives, narrowed the universe of permissible wellness programs employers could offer, thereby undermining provisions in HIPAA and the ACA that permitted employers to offer larger incentives in order to promote the use of wellness programs (and the reduction in healthcare costs that theoretically follows). Both the ADA and GINA rules acknowledge comments from employers and industry groups expressing concern and confusion as to the interplay between the ADA, GINA, and the incentives allowed under HIPAA. Accordingly, EEOC explained its desire to harmonize its regulations with the tri-department regulations that implement the ACA's 30% incentive cap in order to provide clarity to employers about the use of incentives. <u>See</u> ADA Rule, 81 Fed. Reg. at 31,129, 31,132, 31,134–35; GINA Rule, 81 Fed. Reg. at 31,144, 31,146, 31,153–54. EEOC recognized that it was changing its position on incentives, but concluded that permitting

the use of certain incentives related to wellness programs, while limiting them to prevent economic coercion, is "the best way" to promote the ADA's and GINA's goal of preventing employment discrimination while at the same time "effectuat[ing] the purposes of the wellness provisions" of the ADA, HIPAA, and GINA.  ADA Rule, 81 Fed. Reg. at 31,129, 31,132; GINA Rule, 81 Fed. Reg. at 31,146, 31,152–54.

Moreover, EEOC acknowledged comments expressing concern that the 30% permissible incentive level was too high and could become coercive, but determined that this incentive level, "although substantial," was not coercive based on current insurance rates, but that incentives in excess of 30% of the cost of self-only coverage would be coercive.  See ADA Rule, 81 Fed. Reg. at 31,129, 31,132–33; GINA Rule, 81 Fed. Reg. at 31,152–54.   Whether or not these determinations are supported by substantial evidence based on an examination of the full record remains to be seen, but at present, EEOC's decision is reasonable on its face, and the Court cannot conclude that AARP is likely to succeed in arguing that the ADA and GINA rules were not the product of reasoned decision-making.

*          *          *

Thus, AARP has likewise failed to carry its burden of showing a substantial likelihood of success on the merits.  To be clear, the Court is not concluding that the agency has shown a substantial likelihood of success.  This case raises important questions about the complex interaction of the ADA, GINA, the ACA, and HIPAA that implicate the public interest on all sides, and the Court will have the opportunity to consider these questions carefully once the administrative record has been produced and further briefing ensues.  At present, however, the burden of demonstrating success on the merits rests on AARP, and it has failed to meet that burden.

3.   Balance of harms and the public interest

The Court must also balance plaintiff's interests against the harm to EEOC and the public's interest in seeing government regulations implemented as authorized by statute.   "Preliminary injunctive relief may be withheld if contrary to the public interest, even if other factors support such relief, and consideration of the public interest is particularly crucial in a suit seeking to enjoin governmental action being carried out pursuant to a statute intended to serve the public interest." Newdow, 355 F. Supp. 2d at 293 (citing Weinberger v. Romero-Barcelo, 456 U.S. 305, 312–13 (1982)).

The Court finds here that the public interest weighs against granting injunctive relief. AARP has not made a particularly strong showing that its members will suffer irreparable harm if the implementation of the rules is not enjoined preliminarily.  Moreover, enjoining the rules at this late date, when they are set to go into effect in just a few days, will likely cause considerable disruption for employers and insurers who designed their 2017 health plans around the fact that these rules would be implemented.  Although the rules were finalized in May, the purpose of delaying the applicability date until January 1 was specifically to give employers time to bring their wellness programs into compliance.  See ADA Rule, 81 Fed. Reg. at 31,129–30; GINA Rule, 81 Fed. Reg. at 31,147.  Enjoining the rules now will cause uncertainty for employers as to the lawfulness of their wellness programs—and uncertainty for employees as to the terms and cost of their health insurance.  Such a disruption across the entire national employment arena is not warranted based on the showing AARP has made here to date.  And it would be particularly inappropriate to cause such widespread disruption given AARP's unexplained delay in bringing this challenge.

### III.  <u>CONCLUSION</u>

For the foregoing reasons, AARP's motion for a preliminary injunction is denied.  While AARP has standing to bring this suit on behalf of its members, it has not satisfied the standard for the issuance of a preliminary injunction.


_____/s/_____
JOHN D. BATES
United States District Judge

Dated:  <u>December 29, 2016</u>