# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

AARP,

      Plaintiff,

        v.

UNITED STATES EQUAL
EMPLOYMENT OPPORTUNITY
COMMISSION,

      Defendant.

Civil Action No. 16-2113 (JDB)

## MEMORANDUM OPINION

This case concerns AARP's Administrative Procedure Act (APA) challenge to two regulations promulgated by the U.S. Equal Employment Opportunity Commission (EEOC) related to incentives and employer-sponsored wellness programs. See Regulations Under the Americans with Disabilities Act ("the ADA rule"), 81 Fed. Reg. 31,126 (May 17, 2016); Regulations Under the Genetic Information Nondiscrimination Act ("the GINA rule"), 81 Fed. Reg. 31,143 (May 17, 2016). In December 2016, this Court denied AARP's motion for a preliminary injunction to stay applicability of the rules, and the new regulations became applicable on January 1, 2017. See generally AARP v. EEOC, 226 F. Supp. 3d 7 (D.D.C. 2016) (AARP I). EEOC has now filed [31] a motion to dismiss/motion for summary judgment, and AARP has filed [35] a cross-motion for summary judgment. For the reasons that follow, EEOC's motion to dismiss/motion for summary judgment will be denied, and AARP's motion for summary judgment will be granted.[1]

---

[1] There are also two outstanding motions to seal in this case, which will likewise be granted. See ECF Nos. 29, 32. EEOC has moved to file its motion for summary judgment under seal because it identifies Declarant A's employer, and AARP's original member declarations were sealed at an earlier stage of this case to protect the declarants' identities and personal medical information. Although originally opposed to the need for sealing, EEOC

# I. <u>BACKGROUND</u>

This case deals with the incentives—financial or otherwise—that may be offered to employees in connection with employer-sponsored wellness programs, which have become popular in many work places in the last several years as a means of promoting employee health and reducing healthcare costs. The central issue here results from the tension that exists between the laudable goals behind such wellness programs, and the equally important interests promoted by the Americans with Disabilities Act (ADA) and the Genetic Information Nondiscrimination Act (GINA). EEOC is tasked with reconciling these competing concerns, and this case arises out of its most recent attempt to do so.

In its previous opinion, the Court discussed at length the complex regulatory and statutory framework that governs this case; thus, a shorter review will suffice here. <u>See</u> <u>AARP I</u>, 226 F. Supp. 3d at 11–15. Wellness programs are regulated in part by the Health Insurance Portability and Accountability Act (HIPAA), as amended by the Affordable Care Act (ACA), as well as by HIPAA's implementing regulations. HIPAA prevents health plans and insurers from discriminating on the basis of "any health status related factor," but allows covered entities to offer "premium discounts or rebates" on a plan participant's copayments or deductibles in return for that individual's compliance with a wellness program. <u>See</u> 29 U.S.C. § 1182(b)(2)(B); 26 U.S.C. § 9802(b); 42 U.S.C. § 300gg-4(b). A "reward" or incentive may include a discount on insurance costs or a penalty that increases the plan participant's costs because of non-participation in the wellness program. <u>See</u> 26 C.F.R. § 54.9802-1(f)(1)(i). The ACA's amendments to HIPAA, and the accompanying implementing regulations, allow plans and insurers to offer incentives of up to

_____

has filed a public version of its brief with a small redaction, to which the Court cites in this opinion. <u>See</u> ECF No. 31. The Court does not discuss any information in this opinion that would disclose the identity of either the declarants or Declarant A's employer.

30% of the cost of coverage in exchange for an employee's participation in a health-contingent wellness program, a kind of wellness program in which the reward is based on an insured individual's satisfaction of a particular health-related factor.  See Incentives for Nondiscriminatory Wellness Programs in Group Health Plans ("the 2013 HIPAA regulations" or "2013 HIPAA rule"), 78 Fed. Reg. 33,158, 33,180.  Neither the ACA nor the 2013 HIPAA regulations impose a cap on incentives that may be offered in connection with participatory wellness programs, which are programs that do not condition receipt of the incentive on satisfaction of a health factor.  Id. at 33,167.

However, because employer-sponsored wellness programs often involve the collection of sensitive medical information from employees, including information about disabilities or genetic information, these programs often implicate the ADA and GINA as well.  As both the ADA and GINA are administered by EEOC, this brings wellness programs within EEOC's purview.  The ADA prohibits employers from requiring medical examinations or inquiring whether an individual has a disability unless the inquiry is both job-related and "consistent with business necessity."  42 U.S.C. § 12112(d)(4)(A).  But the ADA makes some allowances for wellness programs: it provides that an employer may conduct medical examinations and collect employee medical history as part of an "employee health program," as long as the employee's participation in the program is "voluntary".  Id. § 12112(d)(4)(B).  The term "voluntary" is not defined in the statute.  Similarly, GINA prohibits employers from requesting, requiring, or purchasing "genetic information" from employees or their family members.  Id. § 2000ff-1(b).  The definition of genetic information includes an individual's genetic tests, the genetic tests of family members such as children and spouses, and the manifestation of a disease or disorder of a family member.  See id. § 2000ff(4)(A). Like the ADA, GINA contains an exception that permits employers to collect this information as

part of a wellness program, as long as the employee's provision of the information is voluntary. Id. §§ 2000ff-1(b)(2)(A)–(B). Again, the meaning of "voluntary" is not defined in the statute.

Thus, while HIPAA and its implementing regulations expressly permit the use of incentives in wellness programs, uncertainty existed as to whether the "voluntary" provisions of the ADA and GINA permit the use of incentives in those wellness programs that implicate ADA- or GINA-protected information. EEOC previously took the position that in order for a wellness program to be "voluntary," employers could not condition the receipt of incentives on the employee's disclosure of ADA- or GINA-protected information. See EEOC Enforcement Guidance on Disability-Related Inquiries and Medical Examinations, No. 915.002 (July 27, 2000), 2000 WL 33407181, at *16–17; Regulations Under the Genetic Information Nondiscrimination Act of 2008 ("the 2010 GINA rule"), 75 Fed. Reg. 68,912, 68,935 (Nov. 9, 2010), codified at 29 C.F.R. § 1635. However, in 2016 EEOC promulgated new rules reversing this position. Those are the rules at issue in this case. The new ADA rule provides that the use of a penalty or incentive of up to 30% of the cost of self-only coverage will not render "involuntary" a wellness program that seeks the disclosure of ADA-protected information. See ADA Rule, 81 Fed. Reg. at 31,133–34. Likewise, the new GINA rule permits employers to offer incentives of up to 30% of the cost of self-only coverage for disclosure of information, pursuant to a wellness program, about a spouse's manifestation of disease or disorder, which, as noted above, falls within the definition of the employee's "genetic information" under GINA.[2] See GINA Rule, 81 Fed. Reg. at 31,144. Unlike the 2013 HIPAA regulations, which place caps on incentives only in health-contingent wellness programs, the incentive limits in the new GINA and ADA rules apply both to participatory and health-contingent wellness programs.

---

[2] The rule does not permit employers to collect this information from the employee or the employee's children, only from the employee's spouse.

AARP filed this suit on behalf of its members in October 2016, challenging both rules under the APA, 5 U.S.C. §§ 702–06.  AARP argues principally that the 30% incentives permitted by the new rules are inconsistent with the "voluntary" requirements of the ADA and GINA, and that employees who cannot afford to pay a 30% increase in premiums will be forced to disclose their protected information when they otherwise would choose not to do so.  AARP sought a preliminary injunction, which the Court denied, finding that AARP had associational standing, but that it had not at that stage shown either irreparable harm or a likelihood of success on the merits.  See AARP I, 226 F. Supp. 3d at 15, 20–26.  Because of the short timeline on which the motion for a preliminary injunction was briefed and decided, the administrative record was not then available for the Court's review.  The administrative record has now been produced, EEOC has now moved to dismiss for lack of jurisdiction, and both parties have also moved for summary judgment.

## II. DISCUSSION

EEOC asks the Court to revisit its ruling regarding AARP's standing, again challenging AARP's status as a membership organization, and arguing that Declarant A, the member-declarant on whom the Court relied in finding that AARP had standing at the preliminary injunction stage, lacks standing based on new factual information that was not previously available.  See Gov't Mot. for Summ. J. [ECF No. 31] at 10–15.  EEOC also argues that the new rules survive the deferential standard of review afforded agency decisions in APA cases, and therefore asks for summary judgment in its favor.  See, e.g., id. at 15.  AARP counters that the incentives allowed by the new rules are inconsistent with the meaning of "voluntary" as used in the statutes, and that EEOC failed to adequately explain its departure from its previous position on incentives.  See Pl.'s Mot. for Summ. J. [ECF No. 35-1] at 1, 24, 39.  The Court will address each issue in turn.

### A. STANDING

EEOC has filed a motion to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1), arguing that AARP has not sufficiently established that it has associational standing to bring suit on behalf of its members in this case. A plaintiff "bears the burden of showing that he has standing for each type of relief sought." Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009). A lack of standing constitutes "a defect in [the Court's] subject matter jurisdiction." Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987). In evaluating a motion to dismiss under Rule 12(b)(1), a court must take as true all factual allegations in the complaint. See, e.g., Jerome Stevens Pharm., Inc. v. Food & Drug Admin., 402 F.3d 1249, 1253–54 (D.C. Cir. 2005). However, in considering jurisdiction, the court "may also consider matters outside the pleadings, and may rest its decision on its own resolution of disputed facts." Advance Am. v. Fed. Deposit Ins. Corp., —F. Supp. 3d—, 2017 WL 2869918, at *2 (D.D.C. July 5, 2017) (citing Herbert v. Nat'l Acad. of Sci., 974 F.2d 192, 197 (D.C. Cir. 1992)).

In order to successfully assert associational standing, AARP must show that: (1) at least one of its members would have standing to sue in his or her own right; (2) the interests it seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the participation of an individual member of the organization in the suit. Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 342–43 (1977). As noted above, the Court found in its previous opinion that AARP has standing to bring this suit. See AARP I, 226 F. Supp. 3d at 16–20. However, EEOC asks the Court to revisit its finding that AARP is a "membership organization" that may assert associational standing, and also raises arguments based on new information about Declarant A that it claims undermines Declarant A's standing. See Gov't Mot. for Summ. J. at 10–15. The Court will accordingly revisit these issues.

1. Membership organization

EEOC contends that AARP does not have "members" on whose behalf it can assert associational standing. The Court analyzed this issue at length in its previous opinion, and observed that the associational standing caselaw is unclear as to what, exactly, constitutes a "membership" organization. AARP I, 226 F. Supp. 3d at 16. In Hunt, the Supreme Court identified several criteria that should be used to determine whether a non-membership organization sufficiently represents its constituents' interests to be able to bring suit on their behalf. These "indicia of membership" are: whether the members play a role in selecting the organization's leadership, guiding the organization's activities, and financing the organization's activities. Hunt, 432 U.S. at 344–45. Some courts have held that these criteria do not apply to "traditional" membership organizations, but no court has precisely defined what that means. See, e.g., Brady Campaign to Prevent Gun Violence v. Salazar, 612 F. Supp. 2d 1, 29 (D.D.C. 2009) ("The inquiry into indicia of membership . . . is necessary only when an organization is not a "traditional" membership organization." (internal quotation marks omitted)). The Court therefore assumed in its previous opinion that the Hunt indicia of membership criteria applied here and found that AARP satisfies these indicia of membership. EEOC challenges this finding, but presents no new facts or law that would call the Court's previous decision into question. See Gov't Mot. for Summ. J. at 10–13.

EEOC argues first that AARP is not a membership organization because it has no "members" within the meaning of D.C. law governing non-profit corporations. See id. at 10 (citing D.C. Code § 29-401.02(24)). But EEOC cites no authority suggesting that state corporations law is dispositive or even relevant to the associational standing inquiry. See, e.g., Citizens Coal Council v. Matt Canestrale Contracting, Inc., 40 F. Supp. 3d 632, 640 (W.D. Pa. 2014) (noting that lack of voting rights was not sufficient to defeat associational standing); Concerned Citizens

Around Murphy v. Murphy Oil USA, Inc., 686 F. Supp. 2d 663, 675 (E.D. La. 2010) (noting that "[c]orporate formalities and formal membership structure are not constitutional requirements for associational standing"). The Court will not disturb its prior ruling on this basis.

EEOC next argues that AARP has not shown that it is a membership organization because it has not shown that Declarant A serves on AARP's Board of Directors, serves on a policy committee, or has ever completed an AARP survey, factors that the Court previously identified in finding that AARP satisfied the indicia of membership criteria. See AARP I, 226 F. Supp. 3d at 17; see also Gov't Mot. for Summ. J. at 11–12. Unless Declarant A can show that he participates in these activities, the argument goes, he is not a member and AARP has failed to show that it has associational standing. See U.S. Chamber of Commerce v. EPA, 642 F.3d 192, 199 (D.C. Cir. 2011) ("When a petitioner claims associational standing, it is not enough to aver that unidentified members have been injured. Rather, the petitioner must specifically identify members who have suffered the requisite harm." (emphasis added) (internal citation and quotation marks omitted)). But EEOC's argument appears to go more towards how active a member Declarant A is in AARP, not whether he is a member. Declarant A has as much right to participate in the activities that the Court identified as any other member of AARP, and courts do not appear to analyze to what extent an identified member partakes in membership activities in determining whether an organization has associational standing.

However, the Court acknowledges, as it did in its previous opinion, that whether AARP satisfies the indicia of membership criteria is a close question here. See AARP I, 226 F. Supp. 3d at 17–18. AARP's members play less of a role in the running of the organization than do members of organizations who, for example, directly elect their leadership and hold regular general membership meetings. See, e.g., ACLU of Nebraska, https://www.aclunebraska.org/en/2017-

board-director-elections (noting that "[a]ll ACLU members in Nebraska have been mailed a ballot for our Board of Directors Election"); Constitution of the NAACP, at 3–4, http://www.naacp.org/wp-content/uploads/2016/11/Constitution-eff.-Oct-2016-1.pdf. But AARP members are not akin to Netflix subscribers, i.e., mere "customers," as EEOC suggests, nor does AARP fit the mold of those organizations whom courts have consistently found may not assert associational standing. See, e.g., Gettman v. Drug Enf't Admin., 290 F.3d 430, 435 (D.C. Cir. 2002) (readers of magazine were not members for associational standing purposes); Fund Democracy LLC v. SEC, 278 F.3d 21, 25–26 (D.C. Cir. 2002) (past work with groups of individual investors did not render the investors "members" of Fund Democracy); Am. Legal Found. v. FCC, 808 F.2d 84, 89–90 (D.C. Cir. 1987) (viewers who regularly watch the news were not members of media watchdog group for associational standing purposes); Conservative Baptist Ass'n of Am. v. Shinseki, 42 F. Supp. 3d 125, 134 (D.D.C. 2014) (individual members of congregation were not members of an association made up exclusively of churches); Wash. Legal Found. v. Leavitt, 477 F. Supp. 2d 202, 210–11 (D.D.C. 2007) (members of a mailing list, without more, did not constitute members for purposes of associational standing). AARP lies somewhere in between these two poles.

But as the Court previously recognized, the associational standing cases are not specific about what it means for members to "play a role in" the leadership of an organization, the financing of an organization, or in guiding the activities of an organization. AARP members play a role in all of these activities, even if they could play a stronger role, and EEOC has once again failed to point to any cases that would suggest that what AARP members do is insufficient to establish associational standing. Without more, the Court is wary of a ruling that would bar not only AARP from asserting associational standing, but also bar other repeat litigators whom courts have

routinely held are able to assert associational standing as "traditional membership organizations." See, e.g., Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc., 528 U.S. 167, 181–84 (2000); Am. Trucking Ass'n v. Fed. Motor Carrier Safety Admin., 724 F.3d 243, 247 (D.C. Cir. 2013); WildEarth Guardians v. Jewell, 738 F.3d 298, 305–07 (D.C. Cir. 2013). Accordingly, the Court will not disturb its prior ruling regarding AARP's status as a membership organization.

 2.  Individual member's standing to sue

 In order to assert associational standing, AARP must show that one of the members it purports to represent would have individual standing to challenge the ADA rule and the GINA rule. See Nat'l Biodiesel Bd. v. EPA, 843 F.3d 1010, 1015 (D.C. Cir. 2016). The Court previously found that Declarant A would have standing with respect to both rules. AARP I, 226 F. Supp. 3d at 18–19. EEOC now argues that Declarant A would not have standing to sue, based on new information about the collective bargaining agreement between Declarant A's union and his employer. EEOC has learned that the agreement in force for 2015–17 provided that the employer would pay an additional one percent of health insurance premiums for individuals who disclose confidential health information through completing a health risk assessment, and an additional one percent for those individuals who participate in biometric screenings. See Gov't Mot. for Summ. J. at 13–14. That agreement also included a disease management program for one disease, in which all plan participants were eligible to participate, but Declarant A's spouse does not have the condition covered under the original agreement.[3] However, the agreement stated that additional disease management programs were under consideration.

 After the current round of briefing ended, EEOC learned that this collective bargaining agreement was renewed through 2020. See Notice of Factual Development [ECF No. 41-1] at 2;

---

[3] EEOC thus appears to be incorrect when its states in its brief that the original agreement did not provide for spousal incentives. See Gov't Mot. for Summ. J. at 15.

Hrg. Tr. [ECF No. 45] at 37:10–13. The renewed agreement took effect on July 1, 2017 and maintains the incentive levels for completing the HRA and participating in biometric screening, but now adds incentives for plan participants, including spouses, to participate in additional disease management programs for certain diseases. Those who participate will have their co-payments waived on certain medications. Declarant A's spouse informed AARP counsel that she has one of the conditions covered by the new incentive program. See Pl.'s Resp. to Notice of Factual Development [ECF No. 42] at 1–2; see also Hrg. Tr. at 11:19–13:8, 29:25–30:4.

With respect to the ADA rule, EEOC argues that because Declarant A's collective bargaining agreement only imposes incentives of 2%, Declarant A may not challenge the "full extent" of the ADA rule, which allows incentives of up to 30%. EEOC additionally points out that AARP has conceded that some level of incentives would be permissible, i.e., consistent with the ADA's voluntariness requirement. See Gov't Reply [ECF No. 38] at 11. Therefore, Declarant A would at most only be able to challenge a 2% incentive limit.

But the government's approach—parsing standing to challenge the rule by the particular incentive level—makes little sense. Under EEOC's approach, only someone whose employer has adopted an incentive level of 30% would have standing to challenge the rule. See Gov't Reply at 11. Yet the provision of the ADA rule that AARP—with the help of Declarant A—challenges permits employers to offer incentives (or impose penalties) of up to 30% of the cost of self-only coverage. EEOC does not appear to disagree that Declarant A would have standing to challenge "part" of the rule, because his employer does impose a 2% incentive for participation in its wellness program. But it is unclear to the Court how Declarant A could challenge part of the rule without challenging all of it. Presumably, if the Court were to find that a 2% incentive limit was arbitrary and capricious or otherwise inconsistent with the ADA, the 30% incentive limit created by the rule

would also have to fall. It therefore makes sense to allow Declarant A to challenge the rule even though his employer has not, at this time, taken advantage of the "full extent" of the rule.

In short, Declarant A has suffered an injury in being required to pay more for his health insurance than he otherwise would pay because he has declined to disclose information about his medical conditions to his employer as part of his employer's wellness program. This injury is traceable to the ADA rule because the rule makes legal Declarant A's employer's use of incentives in its wellness program, which was illegal—or at the very least legally uncertain—before the rule was promulgated. See Animal Legal Def. Fund v. Glickman, 154 F.3d 426, 440–44 (D.C. Cir. 1998) (en banc). The Court may remedy this injury by enjoining enforcement of the rule. Declarant A therefore has amply demonstrated that he would have standing to challenge the ADA rule.

With respect to the GINA rule, the Court previously held that, once permitted to do so, Declarant A's employer was likely to adopt incentives for the collection of spousal information, and that Declarant A had therefore shown a sufficient likelihood of injury. AARP I, 226 F. Supp. 3d at 18–19; see also Stillwell v. Office of Thrift Supervision, 569 F.3d 514, 519 (D.C. Cir. 2009) ("[W]hen an agency adopts a rule with the purpose and substantially probable effect of economically helping regulated Party A and hindering Party B, Party B ordinarily will have standing to challenge the rule."). In its briefs on the motion for summary judgment, EEOC has argued that Declarant A does not have standing to challenge the GINA rule because Declarant A's employer is constrained by the collective bargaining agreement and cannot unilaterally adopt incentives for spousal information. See Gov't Reply at 10.

However, it is not clear that information about the 2015–17 bargaining agreement would have altered the Court's previous decision. The bargaining agreement came up for renewal at the

end of the 2016–17 school year.  See Gov't Mot. for Summ. J. at 14; Hrg. Tr. at 29:25–30:4.  The Stillwell principle still appears to apply: once able to adopt programs that collected spousal information under the GINA rule, Declarant A's employer was likely to do so in the renewed collective bargaining agreement—and indeed the old agreement indicated that the employer was considering adding new disease management programs that would cover all plan participants, including spouses.  Moreover, the new information about the renewed collective bargaining agreement indicates that the Court's prediction has been borne out.  In renewing the agreement, Declarant A's employer adopted incentives for spouses to participate in additional disease management programs, and Declarant A's spouse apparently suffers from at least one of the covered conditions.  See Pl.'s Resp. to Notice of Factual Development at 1–2; see also Hrg. Tr. at 12:4–13:8.  Declarant A will therefore be required to disclose either his spouse's health information, or forgo the incentive in the form of the co-payment waiver.  Although there is uncertainty about the exact contours of this program, a disease management program must involve the disclosure of at least some information about an individual's manifestation of the disease in order to "manage" it.  The employer's new program thus appears to fall within the scope of the GINA rule.  The new information about the collective bargaining agreement (both the past agreement and the version that took effect on July 1, 2017) therefore provides no basis for the Court to reconsider its conclusion that Declarant A has standing with respect to the GINA rule.

\*          \*          \*

As the government does not dispute the Court's previous findings with respect to the last two factors of the associational standing inquiry—whether this suit is germane to AARP's purpose and whether this suit requires the participation of an individual AARP member—the Court will not rehash those issues here.  Having considered EEOC's new arguments and information with

respect to AARP's status as a membership organization and Declarant A's individual standing to sue, the Court concludes that there is no basis on which to disturb its previous findings regarding AARP's associational standing. Accordingly, the Court finds that AARP has associational standing to challenge both the ADA rule and the GINA rule on behalf of its members, and EEOC's motion to dismiss for lack of jurisdiction is therefore denied.

## B. SUMMARY JUDGMENT

"Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review." Blue Ocean Inst. v. Gutierrez, 585 F. Supp. 2d 36, 41 (D.D.C. 2008). Because of the court's limited review under the APA, the summary judgment standard of Rule 56(a) does not apply when motions for summary judgment are sought in agency review cases. See Fulbright v. McHugh, 67 F. Supp. 3d 81, 89 (D.D.C. 2014) (citing Coe v. McHugh, 968 F. Supp. 2d 237, 239 (D.D.C. 2013)). Under the APA, courts must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. Although the scope of review under this standard is narrow, courts must consider "whether the agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors." Fund for Animals v. Babbitt, 903 F. Supp. 96, 105 (D.D.C. 1995) (citing Marsh v. Or. Nat. Res. Council, 490 U.S. 360, 378 (1989)). In short, a court must be sure that the agency "has examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." U.S. Chamber of Commerce v. SEC, 412 F.3d 133, 140 (D.C. Cir. 2005) (alterations in original) (internal quotation marks omitted) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm

Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983)).  Agency actions that are not "the product of reasoned decisionmaking" must be overturned.  Motor Vehicle Mfrs. Ass'n, 463 U.S. at 52.  Here, EEOC argues that both the ADA rule and the GINA rule survive this deferential standard of review. AARP generally makes the same two arguments with respect to both rules: first, that the level of incentives is inconsistent with the meaning of the term "voluntary" as used in the statutes; and second, that EEOC failed to adequately explain its decision to reverse its stance on incentives and adopt the 30% incentive levels.

Both parties agree that EEOC's interpretation of the term "voluntary" in both the ADA and GINA should be reviewed under the two-step analysis set forth in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).[4]  Under that analysis, a court first determines whether "Congress has directly spoken to the precise question at issue"; if so, Congress's meaning must control, and the agency receives no deference.  Id. at 842–43.  But if instead the statute is silent or ambiguous as to the specific issue, the court must determine whether the agency's interpretation is based on a permissible construction of the statute.  Id. at 843.

---

[4] After some consideration, the Court has concluded that the parties are correct, and that it is more appropriate to consider the central issue in this case—whether AARP has adequately explained its decision to permit incentives of up to 30% of the cost of coverage—solely under Chevron, rather than to consider the use of incentives generally under Chevron and then analyze the 30% incentive level separately under the APA's more general arbitrary and capricious standard.  EEOC has defined the term "voluntary" in both the ADA and GINA to permit incentives of up to 30%; in other words, the 30% level is an intrinsic part of the agency's chosen definition of the term.  Thus, this is a matter solely of interpretation, rather than a question of interpretation and then separately of the agency's application of that interpretation to a specific situation.  Compare Humane Soc'y of the United States v. Zinke, No. 15-5041, 2017 WL 3254932, at *13–16 (D.C. Cir. Aug. 1, 2017) (analyzing under Chevron the agency's decision to interpret the term "range" as a species' current range rather than its historical range, and then analyzing under the arbitrary and capricious standard the agency's conclusions about the specific threatened status of gray wolves within their current range), with Se. Ala. Med. Ctr. v. Sebelius, 572 F.3d 912, 919–920 (D.C. Cir. 2009) (analyzing under Chevron whether the agency adequately explained its decision to define language in the Medicare statute about "the proportion . . . of hospitals' costs which are attributable to wages and wage-related costs," 42 U.S.C. § 1395ww(d)(3)(E), to include postage costs).

1.  *Chevron* step one and the definition of "voluntary"

Although the parties likewise agree that both statutes are ambiguous about the meaning of "voluntary," and that the issue here is about whether the agency's rules survive <u>Chevron</u> step two, the Court will nevertheless briefly consider <u>Chevron</u> step one, i.e., whether the meaning of "voluntary" as used in the ADA and GINA is ambiguous. <u>See</u> Hrg. Tr. at 16:22–17:2, 28:20–23, 46:6–7. The ADA provides that a "covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program." <u>See</u> 42 U.S.C. § 12112(d)(4)(B). Likewise, GINA permits a covered entity to collect the genetic information of an employee where "health or genetic services are offered by the employer, including such services offered as part of a wellness program," so long as the employee "provides prior, knowing, voluntary, and written authorization." <u>Id.</u> §§ 2000ff-1(b)(2)(A)–(B). Neither the ADA nor GINA offers a definition of the term "voluntary," or explains what it means to participate in a "voluntary" medical examination or to voluntarily provide medical information in order to participate in a wellness program. Furthermore, nothing in either statute directly prohibits the use of incentives in connection with wellness programs; indeed, neither statute speaks to the level of permissible incentives at all. However, because the word "voluntary" is used in very similar contexts in both statutes—i.e., the voluntary disclosure of protected medical information—the meaning of the word as used in both the ADA and GINA is presumably the same. <u>See, e.g.</u>, <u>Erlenbaugh v. United States</u>, 409 U.S. 239, 244 (1972); <u>United States v. Villanueva-Sotebo</u>, 515 F.3d 1234, 1248 (D.C. Cir. 2008).

"When Congress has not supplied a definition, we generally give a statutory term its ordinary meaning." <u>Yates v. United States</u>, 135 S. Ct. 1074, 1091 (2015) (Kagan, J., dissenting) (citing <u>Schindler Elevator Corp. v. United States ex rel. Kirk</u>, 131 S. Ct. 1885, 1891 (2011)). The

word "voluntary" has several definitions, a few of which could be applicable here. Webster's New International Dictionary includes definitions such as "proceeding from the will, or from one's own choice or full consent," "unconstrained by interference; unimpelled by another's influence," and "acting or done of one's own free will without valuable consideration." Webster's New International Dictionary 2858 (2d ed. 1934). The definitions in the third edition are largely unchanged. See Webster's New International Dictionary 2564 (3d ed. 1961). Black's Law Dictionary gives similar definitions: "done by design or intention," "unconstrained by interference; not impelled by outside influence," and "without valuable consideration." Voluntary, Black's Law Dictionary (10th ed. 2014). The exact meaning of the term "voluntary" in the statutes thus appears to be ambiguous: voluntary could mean something along the lines of "free from coercion," or it could mean "without valuable consideration." In defining "voluntary" to permit a 30% incentive level, the agency has clearly chosen an interpretation consistent with the former, rather than the latter, understanding of the term. Because the statutes are ambiguous and this interpretation is within the range of interpretations possible under the statutes, the Court will move on to Chevron step two. See, e.g., Village of Barrington v. Surface Transp. Bd., 636 F.3d 650, 660 (D.C. Cir. 2011).

   2.   *Chevron* step two

   At this stage of the analysis, the Court will defer to the agency's chosen interpretation of the meaning of "voluntary" if the agency has offered a reasoned explanation for its decision. Id. In the D.C. Circuit, "[a] 'reasonable' explanation of how an agency's interpretation serves the statute's objectives is the stuff of which a 'permissible' construction is made…; an explanation that is 'arbitrary, capricious, or manifestly contrary to the statute,' however, is not." Northpoint Tech. Ltd. v. FCC, 412 F.3d 145, 151 (D.C. Cir. 2005) (internal citation omitted) (quoting

*Chevron*, 467 U.S. at 844). The agency's interpretation need not be "the only possible interpretation, nor even the interpretation deemed most reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009). Again, the court is "principally concerned with ensuring that [the agency] has 'examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made,' that the [a]gency's 'decision was based on a consideration of the relevant factors,' and that the [a]gency has made no 'clear error of judgment.'" *Bluewater Network v. EPA*, 370 F.3d 1, 11 (D.C. Cir. 2004) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). As the Court noted above, the real point of contention in this case is whether the agency's decision to interpret the term "voluntary" to permit a 30% incentive level is reasonable and whether the agency has offered an adequate explanation for that interpretation.

### a. The ADA rule

AARP does not dispute that some level of incentives may be permissible under the statutes, see Hrg. Tr. at 21:21–22:6, 60:3–6; rather, it argues that the incentive level that EEOC chose is an unreasonable interpretation of the term "voluntary," see id. at 22:7–23. AARP argues that the 30% level is inconsistent with the "ordinary meaning" of voluntary because this incentive is too high to give employees a meaningful choice regarding whether or not to participate in wellness programs that require the disclosure of ADA-protected information. See Pl.'s Mot. for Summ. J. at 25–30. AARP also argues that EEOC did not adequately justify the reversal of its longstanding policy that prohibited the use of incentives, and did not adequately explain how it determined that the 30% incentive level is a good measure of whether the disclosure of protected medical information is voluntary. Id. at 31–38.

EEOC, for its part, offers three reasons why it reversed its previous interpretation that

"voluntary" precluded the use of incentives and has now determined that the term permits incentives of up to 30% of the cost of self-only coverage. It argues principally that it adopted this new interpretation to harmonize its regulations with the HIPAA regulations governing wellness programs and to induce more individuals to participate in wellness programs, as that was the goal expressed by Congress in the ACA. <u>See</u> Gov't Mot. for Summ. J. at 18 (citing ADA Rule, 81 Fed. Reg. at 31,129); <u>see also</u> Hrg. Tr. at 41:1–6, 42:4–43:5. Second, it states that the 30% incentive level is a reasonable interpretation of "voluntary" based on "current insurance rates," and third, based on a comment letter submitted by the American Heart Association which endorsed the 30% level. <u>See</u> Gov't Mot. for Summ. J. at 18–21; ADA Rule, 81 Fed. Reg. at 31,133; <u>see also</u> Hrg. Tr. at 41:1–42:7.

The determination as to what level of incentive is "coercive" is exactly the kind of agency judgment to which the courts should give some deference. "Voluntariness" is a matter of degree, and the agency is far better suited than the courts to determine what incentive level adequately balances the goals of the ADA, yet helps to achieve some consistency across federal regulations. But in order to receive this deference, the agency's chosen interpretation must be reasonable and must be supported by the administrative record. Having now had the opportunity to review the administrative record in this case, the Court concludes that the agency has not provided a reasoned explanation for its interpretation. EEOC determined that incentives greater than 30% of the cost of coverage would render the disclosure of protected medical information pursuant to a wellness program "involuntary" under the ADA, but an incentive of 30% or less would not. But the Court can find nothing in the administrative record that explains the agency's conclusion that the 30% incentive level is the appropriate measure for voluntariness.

    i.   Consistency with HIPAA

EEOC depends heavily on the argument that it adopted the 30% incentive level in order to harmonize its regulations with HIPAA.  <u>See</u> Hrg. Tr. at 41:1–6, 42:25.  In the abstract, this may be a reasonable goal.  But there are two problems with the agency's underlying reasoning on this point.  The first is that Congress chose the 30% number in a different context: HIPAA is intended to prevent insurance discrimination, and unlike the ADA—or GINA—does not contain an explicit "voluntary" requirement with respect to wellness programs.  While EEOC has chosen to adopt the 30% incentive level as a proxy for voluntariness in the ADA rule, the 30% incentive cap in HIPAA is not intended to serve as a proxy for or interpretation of the term "voluntary."  HIPAA's non-discrimination provisions are designed to prevent health plans and insurers from denying individuals coverage or benefits, or imposing increased costs, based on a health factor.  <u>See, e.g.</u>, 2013 HIPAA Rule, 78 Fed. Reg. at 33,158–59.  Incentives in health-contingent wellness programs—which require a participant to satisfy a particular health standard—are the exception to this rule; insurers and health plans are essentially allowed to discriminate based on a health factor in certain limited circumstances.  <u>Id.</u>  HIPAA has no need to limit incentives in participatory wellness programs, however, because those programs do not require participants to achieve a particular health standard; thus, such programs do not risk discrimination based on a health factor, which is HIPAA's chief concern.  Whether an individual's participation in a wellness program is voluntary is not an issue under that statute.  The regulations are clear, moreover, that compliance with HIPAA does not guarantee compliance with other federal non-discrimination statutes, including the ADA and GINA.  <u>Id.</u> at 33,168.  Thus, HIPAA does not address, for example, whether employers can require participation in certain wellness programs or require the disclosure of certain information pursuant to a wellness program.

But the ADA does address this, at least with respect to disability information.  The ADA

is designed to prevent discrimination in employment, and the "voluntary" provision of the ADA—like the "voluntary" provision of GINA—is designed to prevent employers from forcing employees to disclose health information that might enable employers to discriminate against them. Permitting the use of incentives in wellness programs does not create an exception to the anti-discrimination provisions of the ADA. Rather, it constitutes an interpretation of an explicit statutory requirement: that an employee's decision to disclose ADA-protected information to an employer be "voluntary." The purpose of a statute, and the way in which a proposed rule furthers the purposes of a statute, is critical to the <u>Chevron</u> step two analysis, <u>see</u> <u>Northpoint Tech.</u>, 412 F.3d at 151, and EEOC does not appear to have considered the purpose of the ADA vis-à-vis HIPAA here, or the way in which the 30% incentive level operates in the context of the ADA. EEOC does not explain why it makes sense to adopt wholesale the 30% level in HIPAA, which was adopted in a different statute based on different considerations and for different reasons, into the ADA context as a permissible interpretation of the term "voluntary"—a term not included in the relevant provisions of HIPAA—beyond stating that this interpretation "harmonizes" the regulations.

This brings us to the second problem with EEOC's justification based on HIPAA: the interpretation the agency adopted—the 30% incentive level—is actually <u>not</u> consistent with HIPAA, as both AARP and multiple comment letters in the administrative record point out. The majority of wellness programs are participatory, rather than health-contingent, <u>see</u> AR 7557 (at large firms, only 5% of wellness programs were health contingent in 2015); Hrg. Tr. at 24:4–12, 43:12–17, and the HIPAA regulations place <u>no</u> cap on participatory wellness programs, <u>see</u> 2013 HIPAA Rule, 78 Fed. Reg. at 33,180. It is only health-contingent wellness programs that are subject to the 30% cap under HIPAA, yet the ADA rule extends this cap to both participatory and

health-contingent wellness programs. Thus, the ADA rule is actually <u>inconsistent</u> with the HIPAA regulations for the majority of wellness programs. The HIPAA regulations also calculate the 30% incentive level differently: that level is based on the <u>total</u> cost of coverage, which includes the cost of family coverage, rather than the cost of self-only coverage that the ADA rule adopts. <u>See</u> 2013 HIPAA Rule, 78 Fed. Reg. at 33,162 ("If, in addition to employees, any class of dependents . . . may participate in the health-contingent wellness program, the reward cannot exceed the applicable percentage of the total cost of the coverage in which the employee and any dependents are enrolled (such as family coverage or employee-plus-one coverage)."). EEOC has thus achieved, at best, only partial consistency with HIPAA for only a minority of wellness programs.

Indeed, most of the comment letters from business and industry groups contained in the administrative record opposed the 30% incentive level because of these inconsistencies, noting that the proposed rule had not provided any meaningful justification for its departure from the 2013 HIPAA regulations. <u>See, e.g.</u>, AR 2630 (Ne. Bus. Grp. on Health); 2711, 2714, 2718 (Health Enhancement Research Org.); 2755 (Bus. Health Coal.); 2894 (Nat'l Bus. Coal. on Health); 2924–29 (Council of Ins. Agents & Brokers); 2965–66 (Bus. Roundtable); 3057–58 (Population Health Alliance); 3074 (Aetna); 3476–78 (U.S. Chamber of Commerce); 3569–70 (members of Congress); 3883 (Tyson Foods). Nowhere in the final rulemaking does EEOC explain why or how the incentive level it adopted, which differs from the approach taken in HIPAA, is consistent with its stated goal of harmonizing its regulations with HIPAA, or conversely, why it ultimately concluded that a departure from the HIPAA regulations was necessary or appropriate.

EEOC's first proffered reason for interpreting the "voluntary" provision of the ADA to permit incentives of up to 30% is thus deeply flawed. Indeed, even assuming that the ADA rule

had achieved consistency with HIPAA, the agency's failure to consider the fact that HIPAA contains no "voluntary" requirement might be fatal to its chosen interpretation. That failure certainly undermines EEOC's first reason for its interpretation. But EEOC's first reason is further underminded by the fact that the ADA rule does not, in fact, achieve EEOC's desired harmony with HIPAA. EEOC's argument that it adopted the 30% level to harmonize its regulations with HIPAA, therefore, cannot support EEOC's interpretation of the term "voluntary."

      ii.  Current insurance rates

However, EEOC also stated in the final rule that it concluded that the 30% incentive level was a reasonable interpretation of the term "voluntary" (i.e., non-coercive) based on "current insurance rates." ADA Rule, 81 Fed. Reg. at 31,133. The final rule does not elaborate on what these rates are, how the agency evaluated them, or what bearing they have on the key question of whether an incentive level is "coercive" or "voluntary." Indeed, EEOC conceded at oral argument that the administrative record contains no study or analysis of these "current insurance rates" or how they relate to the voluntary disclosure of information in wellness programs. See Hrg. Tr. at 41:5–23.

The only reference to insurance rates the Court can find in the administrative record is contained in the Kaiser Family Foundation's Employer Health Benefits 2014 Annual Survey, which analyzes changes in health plans, including increases in premiums, plan enrollment, employee-employer cost sharing, etc., between 2013 and 2014. See AR 7563–804. This study contains little that is relevant to the voluntariness question, and EEOC does not appear to rely on this study in either its briefs or the rule. The study does contain some statistics that relate the cost of premiums and income levels, which theoretically might be relevant here, but this information is included in studies about premium costs based on "firm characteristics," including the

percentage of "low-wage level" or "high-wage level" workers a firm has. Low-wage level workers are defined as those who earned less than $23,000 a year in 2014; high-wage level workers are those who earned more than $57,000 a year. See, e.g., id. at 7605–06, 7611. The study concludes that firms with more high-wage level workers have somewhat higher annual premiums than those with more low-wage level workers. Id. at 7598–99, 7605–06, 7611. But this doesn't tell us anything about what incentive level would render a wellness program involuntary or how the agency determined what incentive level would be coercive. Thus, like the argument about harmonizing its regulations with the HIPAA regulations, EEOC's argument about current insurance rates appears to be utterly lacking in substance based on a review of the administrative record.

### iii. Comment letters

Finally, EEOC asserts that it relied on comment letters in determining that the 30% incentive level was a reasonable interpretation of "voluntary." The only specific comment letter it identifies, however, is that submitted by the American Heart Association, which endorses the 30% incentive level. See AR 2780. That letter states that "[i]t makes sense to make the incentive level consistent across all types of programs, whether participatory or health-contingent," but does not explain why. Id. Moreover, the letter does not explain why the 30% level is an appropriate measure of voluntariness—ironically, the letter even notes that it "is not intuitive that a program is completely voluntary with an incentive attached that can significantly increase the cost of health insurance." Id.; see also id. at 2784 (remarking that the incentive level is "not entirely consistent with voluntary"). Finally, even this letter urges EEOC to consider basing the 30% calculation on the total cost of coverage, to achieve greater consistency with the ACA and HIPAA. Id. at 2780–81. While EEOC is certainly entitled to rely on comments, as it points out, see Gov't Mot. for

Summ. J. at 21 (citing <u>Nat'l Ass'n of Regulatory Utility Comm'rs v. FCC</u>, 737 F.2d 1095, 1125 (D.C. Cir. 1984)), this particular letter lends little weight to EEOC's explanation because it contains largely conclusory statements and no analysis as to why EEOC's chosen incentive level is a reasonable interpretation of "voluntary." The letter is particularly unpersuasive given that the majority of the comment letters expressed <u>opposition</u> to EEOC's chosen incentive level (either because the 30% level was too low or too high). EEOC protests that it was "presented with . . . every opinion under the sun" and was therefore entitled to rely on some but not others, and the Court does not dispute this. But the agency must explain <u>why</u> it chose to rely on certain comments rather than others, and it did not do so here.

### iv. Failure to consider relevant factors

Significantly, the Court can find nothing in the administrative record—or the final rule— to indicate that the agency considered any factors that are actually relevant to the voluntariness question. Having chosen to define "voluntary" in financial terms—30% of the cost of self-only coverage—the agency does not appear to have considered <u>any</u> factors relevant to the financial and economic impact the rule is likely to have on individuals who will be affected by the rule. <u>See, e.g.</u>, <u>Motor Vehicle Mfrs. Ass'n</u>, 463 U.S. at 42–43. For example, commenters pointed out that, based on the average annual cost of premiums in 2014, a 30% penalty for refusing to provide protected information would double the cost of health insurance for most employees. AR 3778– 79 (Bazelon Ctr. for Mental Health Law), 3833 (Disability Rights Educ. & Def. Fund); <u>see also</u> <u>id.</u> at 3493 (ACLU) (noting that most employees already contribute 20–30% of the cost of coverage). At around $1800 a year, this is the equivalent of several months' worth of food for the average family, two months of child care in most states, and roughly two months' rent. <u>See</u> <u>id.</u> at 3302 (Nat'l Women's Law Ctr.); <u>see also</u> <u>id.</u> at 3492 (ACLU) (noting average annual premium);

3778 (Bazelon Ctr. for Mental Health Law) (same); 3833 (Disability Rights Educ. & Def. Fund) (same). The agency did not consider the distributional impacts of the rule and what impact income level would have on whether an incentive as a given percentage of premium costs would be coercive for an employee. Indeed, many of the comments in the administrative record expressed concern that the 30% incentive level was likely to be far more coercive for employees with lower incomes, and was likely to disproportionately affect people with disabilities specifically, who on average have lower incomes than those without disabilities. See, e.g., id. 2680 (comment from Dr. Anna Slomovic suggesting that EEOC commission a study to examine the impact of the rule on low-income employees); 3242 (Epilepsy Found.); 3302–03 (Nat'l Women's Law Center); 3496 (ACLU); 3506–07 (Am. Psychological Ass'n); 3775 (Bazelon Ctr. for Mental Health Law); 3829–30 (Disability Rights Educ. & Def. Fund); 7949 (RAND study noting that "high powered" incentives of 20% or more might place a disproportionate burden on lower-paid workers).

While EEOC is not required to respond to every comment it receives, it does have to respond "in a reasoned manner to those that raise significant problems." Covad Commc'ns Co. v. FCC, 450 F.3d 528, 550 (D.C. Cir. 2006). The possibility that the ADA rule could disproportionately harm the group the ADA is designed to protect would appear to pose a "significant problem." This again demonstrates EEOC's failure to engage meaningfully with the text and purpose of the ADA. EEOC acknowledged in the final rule that some commenters expressed concern that the incentive level was too high, see 81 Fed. Reg. at 31,129, 31,132–33, but it did not otherwise respond to these specific concerns—for example, by explaining why it did not consider certain economic factors or why it chose to discount so many commenters' consistent concerns in promulgating the final rule.

EEOC argues, however, that under the ACA, large employers, defined as those with fifty

or more full-time employees, are already incentivized to offer full-time employees "affordable" coverage, or face an additional tax. See Gov't Mot. for Summ. J. at 19–20; see also 26 U.S.C. § 36B(c)(2)(C); 26 C.F.R. § 1.36B-2(c)(3)(v)(A)(4). Thus, EEOC concluded in the ADA rule that this ACA provision and its implementing regulations "promotes the ADA's interest in ensuring that incentive limits are not so high as to make participation in a wellness program involuntary." See 81 Fed. Reg. at 31,132. But this conclusion ignores the fact that the ADA covers employers with 15 or more employees, 42 U.S.C. § 12111(5)(A), while the ACA "affordability" tax applies to employers with 50 or more employees. The final rule does not discuss the fact that many ADA-covered employees will not be protected by this ACA provision. In addition, the ACA tax only "incentivizes" employers—they may choose to pay the tax and offer "unaffordable" coverage to employees. The ADA's voluntariness provision, on the other hand, requires that employees be protected from coerced disclosure of ADA-protected information—and it is EEOC who is charged with protecting them.

Most importantly, though, EEOC's ACA-based argument cannot support EEOC's interpretation of the term "voluntary" on its own, or make up for EEOC's failure to give a reasoned explanation for its decision to define "voluntary" as a 30% incentive cap in the first place. Indeed, EEOC's reliance on this argument here suggests that EEOC recognizes that the 30% incentive level may not be a meaningful measure of "voluntariness": EEOC is essentially arguing that it doesn't matter if the 30% incentive level is too high—i.e., inconsistent with the voluntary requirement—because another statutory provision might prevent employers from imposing insurance costs on employees that could coerce them into disclosing protected information. Needless to say, this is a woefully insufficient justification for EEOC's chosen statutory interpretation.

*          *          *

To be clear, there is plenty of evidence to support EEOC's conclusion that regulation was needed in this area to clarify employer obligations with respect to wellness programs, see, e.g., AR 2895, 2923, 3462; see also AARP I, 226 F. Supp. 3d at 13–15 (discussing regulatory history of the ADA and GINA rules), and there is also evidence that the use of incentives increases participation in wellness programs, see AR 3000, 3053, 7836, 7908–34, 7949, 8175; see also id. at 7105 (comment on GINA rule).  But EEOC has not justified its decision to interpret "voluntary" in the ADA to permit incentives of up to 30%, because it has not adequately explained how it determined that the 30% incentive level is an adequate measure of voluntariness.  Courts may not "simply accept whatever conclusion an agency proffers merely because it is the agency's judgment." Tripoli Rocketry Ass'n, Inc. v. ATF, 437 F.3d 75, 77 (D.C. Cir. 2006).  While the Court acknowledges that some arbitrary line drawing may be necessary in determining where to set the incentive level, the agency must still point to some evidence in the record that reasonably supports where it chose to draw the line, and it must also respond to "substantial criticisms" of that choice. See United Distribution Cos. v. FERC, 88 F.3d 1105, 1141 n.45 (D.C. Cir. 1996); see also Emily's List v. FEC, 581 F.3d 1, 22 n.20 (D.C. Cir. 2009).  In short, the process by which an agency reaches a given result "must be logical and rational."  Tripoli, 437 F.3d at 77.

That has not been the case here.  The agency's proffered reasons do not support its determination that permitting incentives of up to 30% is a reasonable interpretation of the ADA's voluntariness requirement.  Based on the administrative record, it appears that EEOC co-opted the 30% incentive level from the HIPAA regulations without giving sufficient thought to whether or how it should apply in the context of the ADA, and particularly in the context of the ADA's requirement that wellness programs be "voluntary."  Indeed, EEOC does not appear to have

considered any factor that actually speaks to whether a given incentive level is voluntary or coercive. Because of this, the Court concludes that EEOC's interpretation of the ADA's voluntariness requirement is neither reasonable nor supported by the administrative record.

b. The GINA rule

With respect to the GINA rule, AARP argues that the interpretation of the term "voluntary" is unreasonable because it is inconsistent with GINA's definition of "genetic information," in that the rule interprets the "voluntary" requirement to treat spousal information differently from other types of genetic information. However, AARP also argues that the rule suffers from the same shortcomings as the ADA rule, in that EEOC failed to consider factors relevant to voluntariness and significant comments and did not otherwise support its decision to impose the 30% incentive level for GINA. See Pl.'s Mot. for Summ. J. at 39–45.

GINA defines "genetic information" to include the genetic tests of family members of an individual, and the manifestation of a disease or disorder in family members; "family members" includes dependents by marriage. See 42 U.S.C. §§ 2000ff(3), (4); 29 U.S.C. § 1181(f)(2). The new GINA rule permits employers to impose a 30% incentive/penalty on employees to encourage the disclosure of a spouse's manifestation of disease or disorder. GINA Rule, 81 Fed. Reg. at 31,144. But the rule does not permit employers to use incentives to collect information about the spouse's genetic information, or about the manifestation of diseases or disorders in an employee's children, or the genetic information of the children. Id. AARP argues that this provision is inconsistent with the definition of genetic information in GINA, because EEOC is giving more protection to one type of genetic information than to another. According to AARP, this also renders the GINA rule internally inconsistent, in that the meaning of "voluntary" disclosure with respect to spousal information is different than the meaning of "voluntary" disclosure with respect

to all other genetic information, because one meaning permits the use of incentives and the other does not.

The Court is not convinced that EEOC's decision to distinguish between different types of genetic information with respect to incentives necessarily renders the rule unreasonable or inconsistent with GINA. If the "voluntary" requirement in GINA gives the agency discretion to allow incentives for the disclosure of genetic information generally, as AARP agrees, it likely also gives the agency discretion to allow employers to incentivize the disclosure of some protected information, but not all. Somewhat more troubling, however, is the explanation EEOC gave for its decision to distinguish between spousal information and other genetic information, and it is this in particular with which AARP takes issue. EEOC concluded that there was less risk of employer discrimination based on the disclosure of a spouse's medical history, because the spouse's history does not reveal <u>actual</u> genetic information about the employee, and therefore cannot be used to make predictions about an employee's health. While this premise is certainly logical, it appears to miss the purpose of including spousal information in the definition of genetic information in the first place. Employers are likely to discriminate on the basis of health status or genetic information due to the potential for increased insurance costs to the employer, and this concern about increased costs would apply to anyone covered by the health plan, including dependents, not just to the employee. That, presumably, is why Congress included spousal information in the definition of genetic information of the employee. Again, the purpose or objectives of the statute are important in considering the reasonableness of the agency's statutory interpretation, and EEOC does not appear to have considered—or even acknowledged—this concern at all. EEOC's proffered explanation therefore appears to be somewhat inconsistent with GINA's objectives.

Aside from this issue, however, the GINA rule also suffers from the same problems as the

ADA rule, in that EEOC did not adequately explain the basis for its decision to interpret GINA's "voluntary" provision as permitting the 30% incentive level. In the proposed GINA rule, EEOC originally based the 30% incentive level on the total cost of coverage for the plan in which the employee and any dependents were enrolled, rather than the total cost of self-only coverage as in the ADA rule. See Proposed GINA Rule, 80 Fed. Reg. 66853, 66857 (Oct. 30, 2015). This decision received extensive criticism in the comment letters, however, and EEOC ultimately decided to adopt the same incentive level it used in the ADA rule, i.e., 30% of the cost of self-only coverage. See, e.g., AR 7198–99 (Soc'y for Human Res. Mgmt.); 7205 (Unite Here Health); 7212–14 (Coll. & Univ. Prof'l Ass'n for Human Res.); see also GINA Rule, 81 Fed. Reg. at 31,154. In fact, in the final rule, EEOC cites its decision in the ADA rule as the basis for its decision to adopt the 30% incentive level in the GINA rule, explaining that it had "determined, in developing the final ADA rule . . . that incentives in excess of 30 percent . . . would be coercive," and therefore there was "no reason" to adopt "a different threshold where the employee's spouse is the individual whose health information is being sought." GINA Rule, 81 Fed. Reg. at 31,154.

As with the ADA rule, however, the administrative record contains no explanation how EEOC concluded that the 30% level was the appropriate measure for voluntariness or is consistent with GINA's statutory requirement that the disclosure of information be voluntary. The American Heart Association submitted a separate comment on the GINA rule endorsing the 30% level, but again offered little basis for doing so that would bolster EEOC's explanation. See AR 6932. The argument that the 30% level was the number "chosen by Congress" fails here for the same reason it failed in the context of the ADA rule: the 30% number was chosen by Congress in a different context under a different statute that did not contain a voluntariness requirement. Simply stating that the 30% level in the GINA rule "draw[s] inspiration from" the HIPAA regulations and the

ACA is not a sufficient explanation for this interpretation of the statutory term "voluntary." See Hrg. Tr. at 49:8–11. Moreover, the GINA rule likewise does not accomplish EEOC's stated goal of harmonizing its regulations with HIPAA, nor did EEOC explain why a departure from the HIPAA regulations was appropriate, beyond the wholly conclusory statement that permitting a higher incentive would render the disclosure of GINA-protected information involuntary. See, e.g., AR 7205 (Unite Here Health); 7216 (Coll. & Univ. Prof'l Ass'n for Human Res.) ("The Commission has not included within either of its proposals [the GINA rule and the ADA rule] any meaningful justification for this unwise departure.").

Once again, the administrative record contains little evidence that EEOC actually analyzed any factors that might be relevant to the economic "coerciveness" of an incentive level in GINA, for example, factors related to income. This would seem to be particularly important with the adoption of the GINA rule, because with the addition of the GINA rule an employee and his or her family may face "stacked" penalties or incentives for the disclosure of information. In other words, an employer may adopt a 30% incentive for the disclosure of an employee's ADA-protected information, as well as a 30% incentive for the disclosure of the employee's spouse's GINA-protected information. See GINA Rule, 81 Fed. Reg. at 31,146. The potential cumulative effect of these incentives is surely relevant to the question of whether disclosure is voluntary or not. But beyond the mention in the final rule that stacking is possible, there is no indication that EEOC considered this at all.

In short, EEOC's explanation for its chosen interpretation of "voluntary" in the GINA rule fares no better than its explanation in the ADA rule—principally because EEOC relies primarily on its decision in the ADA rule as the basis for its decision here. Therefore, the Court again finds that the agency has failed to give a reasoned explanation for its decision to interpret the term

voluntary to allow incentives of up to 30% of the cost of self-only coverage.

*          *          *

EEOC has failed to adequately explain its decision to construe the term "voluntary" in the ADA and GINA to permit the 30% incentive level adopted in both the ADA rule and the GINA rule. Neither the final rules nor the administrative record contain any concrete data, studies, or analysis that would support any particular incentive level as the threshold past which an incentive becomes involuntary in violation of the ADA and GINA. To be clear, this would likely be a different case if the administrative record had contained support for and an explanation of the agency's decision, given the deference courts must give in this context. But "deference" does not mean that courts act as a rubber stamp for agency policies. See Presley v. Etowah Cty. Comm'n, 502 U.S. 491, 508 (1992) ("Deference does not mean acquiescence."). When choosing from a range of possible interpretations of a statutory term, the agency must give a reasoned explanation for its decision. Absent such reasoning or factual support here, the Court "must conclude" that the agency has made its decision arbitrarily. See Ass'n of Private Colls. & Univs. v. Duncan, 870 F. Supp. 2d 133, 154 (D.D.C. 2012) (citing U.S. Air. Tour Ass'n v. FAA, 298 F.3d 997, 1019 (D.C. Cir. 2002)). Accordingly, EEOC's motion for summary judgment will be denied, and AARP's motion will be granted.

## C.  REMEDY

Having found that both the ADA rule and the GINA rule are arbitrary and capricious, the Court must now decide on the appropriate remedy. An agency's failure to provide a reasoned explanation for its decision requires a court to remand to the agency for further consideration, but does not necessarily require vacatur. See, e.g., Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin., 429 F.3d 1136, 1151 (D.C. Cir. 2005) (citations omitted) ("While

unsupported agency action normally requires vacatur, . . . this court is not without discretion [to remand without vacating]."); Allied-Signal, Inc. v. Nuclear Regulatory Comm'n, 988 F.2d 146, 150 (D.C. Cir. 1993) ("An inadequately supported rule…need not necessarily be vacated."); Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin., 920 F.2d 960, 966 (D.C. Cir. 1990) ("We have commonly remanded without vacating an agency's rule or order where the failure lay in lack of reasoned decisionmaking . . . ").  "The 'decision whether to vacate depends on the seriousness of the [rule's] deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'"  Defs. of Wildlife v. Jackson, 791 F. Supp. 2d 96, 117 (D.D.C. 2011) (alterations in original) (quoting Comcast Corp. v. FCC, 579 F.3d 1, 8 (D.C. Cir. 2009)).  Neither party addresses this issue in their briefs, but at oral argument, unsurprisingly, AARP requested that the Court vacate the rules and EEOC preferred remand to the agency without vacatur.  See Hrg. Tr. at 46:17–25, 65:6–21.

The lack of a reasoned explanation is a serious failing in an agency's decision, because it leaves the Court in doubt as to "whether the agency chose correctly" in making its decision.  See Am. Petrol. Inst. v. Johnson, 541 F. Supp. 2d 165, 185 (D.D.C 2008) (quoting United Mine Workers of Am., 920 F.2d at 967)).  While EEOC has discretion to choose the correct incentive level, the fact that it does not appear to have considered any relevant factors in determining what incentive level best approximates "voluntariness" suggests that the agency's decision may very well be different on remand.  Id. at 185–86.  Thus, this factor weighs in favor of vacatur.

Nevertheless, the second factor, the consequences of vacatur, weighs heavily in favor of simply remanding without vacatur.  The ADA and GINA rules were promulgated in May 2016, took effect in July 2016, and became "applicable" on January 1, 2017, in order to give businesses

time to bring their wellness programs into compliance with these rules. ADA Rule 81 Fed. Reg. at 31,126, 31,129; GINA Rule, 81 Fed. Reg. at 31,143, 31,147. Employer health plans for the year 2017 were undoubtedly designed in reliance on these rules, which have now been "applicable" for eight months. See, e.g., U.S. Chamber of Commerce v. SEC, 443 F.3d 890, 909 (D.C. Cir. 2006) (finding that vacatur was inappropriate because many businesses had already come into compliance with the invalid rule, meaning that vacatur could cause significant disruption in the industry); see also MCI Telecomms. Corp. v. FCC, 143 F.3d 606, 609 (D.C. Cir. 1998) (noting that vacatur would disrupt business plans already made). It is far from clear that it would be possible to restore the status quo ante if the rules were vacated; rather, it may well end up punishing those firms—and employees—who acted in reliance on the rules. See, e.g., Defs. of Wildlife, 791 F. Supp. 2d at 118–19 (citing Sugar Cane Growers Coop. v. Veneman, 289 F.3d 89, 97–98 (D.C. Cir. 2002)). Employees who received incentives from their employers would presumably be obligated to pay these back, which may not be feasible for many; employers who imposed a penalty rather than an incentive would likewise be obligated to repay to employees the cost of the penalty, which again, may or may not be feasible. Vacatur will not remedy the fact that many employees who have chosen to disclose their protected medical information have already done so; this information cannot be made confidential again. Employers who adopted incentives would be faced with the possibility that their current health plans are illegal; at best, employers would once again be left in limbo as to what is permitted and what is not with regard to incentives. In short, this is not a case in which vacatur would simply cause a private party to suffer pecuniary loss. See, e.g., Reed v. Salazar, 744 F. Supp. 2d 98, 119–20 (D.D.C. 2010). Instead, vacatur appears likely to cause potentially widespread disruption and confusion.

Hence, while the Court has serious concerns about the agency's reasoning regarding the

GINA and ADA rules, these concerns are currently outweighed by the "disruptive consequences" that are likely to result from vacatur. Assuming that the agency can address the rules' failings in a timely manner, vacatur "is not the required remedy," and would indeed be inappropriate at this time. <u>AFL-CIO v. Chao</u>, 496 F. Supp. 2d 76, 91 (D.D.C. 2007). Thus, for the present, the Court will remand the rules to EEOC for reconsideration without vacatur.

## **CONCLUSION**

For the foregoing reasons, EEOC's motion to dismiss, or in the alternative, motion for summary judgment, will be denied, and AARP's motion for summary judgment will be granted. The Court concludes that AARP has sufficiently demonstrated that it has associational standing to bring this suit on behalf of its members. EEOC, moreover, has failed to provide a reasoned explanation for its decision to adopt the 30% incentive levels in both the ADA and GINA rules. However, because the Court finds that vacatur of the rules is likely to have significant disruptive consequences, the Court will not vacate the rules and will simply remand them to the agency for reconsideration. A separate order has been issued on this date.

_____/s/_____
JOHN D. BATES
United States District Judge

Dated:  August 22, 2017